ALFRED BOOTH, Respondent, *v.* JEREMIAH S. BUNCE, JAMES
 ESLER, DELPHIN B. COBB, DANIEL McLEOD and JAMES B.
 WINDLE, Appellants.

Where the managing members of an embarrassed corporation unite in forming
 a new one under the general law, and then transfer to it the property of the
 former; and a judgment creditor of the former corporation issues an execution
 upon his judgment and levies the same upon the property so transferred, and
 becomes himself the purchaser at the sale under such execution; and a judg-
 ment creditor of the latter corporation afterwards levies his execution upon
 the same goods as the property of the latter corporation, in an action by the
 former judgment creditors against the latter, for taking such property, the ques-
 tion whether the latter corporation was formed by the acting members of the
 former, to hinder, delay and defraud their creditors, may be raised and sub-
 mitted to the jury on proper evidence.

The question as to the fraudulent purpose of such second corporation involved
 in such inquiry, being submitted to the jury, their finding thereon is conclusive.

When such second corporation has been formed by the acting members of the
 former one, and the property thereof has been transferred to the latter, to
 hinder, delay and defraud the creditors of the former, the property thus
 fraudulently transferred is still liable to be taken on execution as the property
 of the former corporation.

*It seems,* that though a corporation thus fraudulently created, is void as to the
 *bona fide* creditors of the former corporation, it may be treated as a valid cor-
 poration by the *bona fide* creditors of the latter.

In this action the equities of the plaintiff and of the defendant were considered
 equal, but the plaintiff had the possession. Therefore the maxim, *Qui prior
 in tempore, potior est in jure,* was applicable and decided the case.

APPEAL from General Term of the Supreme Court, second
district. The following is a statement of the facts:

The plaintiff, Alfred Booth, is the creditor of the late firm,
composed of William Montgomery and William Garrabrant,
upon two promissory notes for $965.32 each, dated January
1st, 1855, made to one Isaac Reeve, or order, and by him
indorsed over to the plaintiff. Upon these notes he recovered
a judgment against Montgomery & Garrabrant for $2,268.38,
which was filed and docketed in Westchester county clerk's
office December 17th, 1859. Reeve, the payee in the note,
had been copartner of Montgomery in the machine manu-
facturing business at Yonkers, in the county of Westchester.

This firm ceased to exist on the 1st January, 1855, and the notes were given for Reeve's interest in the business. Garrabrant continued a partner with Montgomery until the spring of 1856, when he retired, and the business was carried on by Montgomery and George D. Lund, under the name of Montgomery & Co. The New York Steam Saw-mill and Machine Company became incorporated under the statute on the 20th of October, 1857, by a certificate of that date, duly executed and filed in the clerk's office of the city and county of New York, and a duplicate filed with the secretary of State. This certificate is executed and acknowledged by William Montgomery, Jesse M. Emerson, George D. Lund, Asahel R. Jones and Appleton Oaksmith. On the 21st of October of the same year, Montgomery and Lund made two bills of sale of the stock, property and machinery of the firm at Yonkers, to the New York Steam Saw-mill and Machine Company, who thereupon, and from thence carried on the business of manufacturing machinery, steam engines, &c., in the same place, in its own name, Montgomery superintending and managing the business as the professed agent of the company. After this the company contracted debts and incurred obligations in the course of its business, and manufactured and constructed machinery and steam engines. On the 19th December, 1859, Alfred Booth, the plaintiff in this action, issued an execution upon his judgment against Montgomery & Garrabrant, to the sheriff of Westchester county, who thereupon levied upon the property in the company's machine shop, including the engine in question, and sold the same to Alfred Booth, who thereupon claimed to be the owner thereof. This engine he afterwards sent to No. 222 Pearl street, New York. In the meantime, the New York Steam Saw Mill and Machine Company had become indebted to the defendants Jeremiah S. Bunce, James Esler and Delphin B. Cobb, composing the firm of J. S. Bunce & Co., in the usual course of business, for steam boilers furnished, and on other accounts, which indebtedness assumed the form of a judgment in favor of the firm for $2,513.58, and was docketed and filed in the proper office of the city of New York, on the 31st of March,

1860. Upon this judgment an execution was issued against the saw-mill and machine company to the sheriff of the city and county of New York, on the same day, by virtue of which he levied upon the steam engine in question at No. 222 Pearl street, New York, and sold and delivered the same to the defendants Daniel McLeod and James B. Windle. The present action is brought to recover the value of the engine.

The plaintiff claimed title to the engine under his judgment and execution against Montgomery & Garrabrant, and a sale thereon to himself, on the ground that the "Steam Saw-mill and Machine Company" was a mere fraudulent organization and device got up to defraud the creditors of "William Montgomery & Co.," and that the business carried on under this corporate organization was for the same purpose. The defendants, it seems to be conceded, were *bona fide* creditors of "The Steam Saw-mill and Machine Co.," and claimed title to the engine in like manner as judgment and execution creditors of that company under a sale of the engine as their property. Among the property transferred by Montgomery & Co. to the said corporation was the bed-plate and cylinder of the engine in question. In the spring of 1859, this corporation seems to have discontinued their corporate action; and William Montgomery, who had, during its existence, been its president and principal agent, put up his own sign at his place of business in New York, "Wm. Montgomery, Yonkers Machine Works," but leaving up also a small sign of the saw-mill company on the panel of his door. He dropped the name of the company, in the transaction of business, in July, 1859, and his articles were afterward labeled with his own name, or "William Montgomery & Co.," Machine Works, Yonkers. Some small amount of work had been done upon the engine in question while the name of the corporation was used, and it was completed after he resumed business in his own name. The nominal capital of the corporation so formed was $250,000. No part of this appears to have been paid in cash. Its only actual capital consisted in

the assignment to it of the stock of William Montgomery & Co., together with some old machine patterns, and the good will of the firm of Emerson & Co., who became corporators in the organization. Montgomery & Co, at the time of this organization and transfer of their assets, were embarrassed with debts, and Emerson & Co. had then lately·failed in business. Emerson & Co., previous to their failure, had been the agents for Montgomery & Co. in the sale of their manufactured machinery. The stock of this new company was chiefly used in payment of, or as collateral security for the payment of its debts and of the debts of Montgomery & Co. While Montgomery was the president and principal active executive managing agent of the corporation he was the owner of but one share of its stock, and .Lund, his late copartner, the owner of but one other share. When the testimony closed, the defendants' counsel asked the court to dismiss the complaint on the ground: :

*First.* That there was not sufficient proof in the case to put to the jury the question whether the saw-mill company was formed to defraud the creditors of Montgomery and Lund. This motion was denied and the defendants' counsel excepted.

*Second.* That there was not sufficient proof to put the question to the jury, whether the saw-mill company was formed to hinder, delay or defraud the plaintiff, Booth. The motion was denied on this ground, also, and the defendants'. counsel excepted.

The defendants' counsel then requested the judge to charge the jury upon various legal propositions, to the three first of which the judge charged as requested. The *fourth* proposition was, "that if fraud be found by the jury, then the plaintiff purchased the property subject to the debts of the company, and the engine in question was still liable to be levied upon by the company's creditors, and such levy could not be resisted in this action. The court refused so to charge, because the request was immaterial in this action, and the defendants' counsel excepted.

*Fifth.* If the jury find that the company was formed by ·Montgomery and Lund to defraud their creditors, the plaintiff

not being a creditor of the firm, he is not, on that account, entitled to recover.

His honor refused so to charge, and defendants' counsel then and there duly excepted.

*Sixth.* If the jury find that the company was formed by Montgomery and Lund to defraud their creditors, and that the formation of the company was void on account of such fraud, then the firm of Montgomery & Lund became entitled to the property, and the plaintiff could only levy upon and sell Montgomery's interest in that property, and such property was still liable to be levied on by the defendants Bunce, Esler and Cobb, as creditors, and such levy being made in this action, cannot be resisted by Booth, in this case.

His honor refused so to charge, and the defendants' counsel then and there duly excepted.

His honor further charged the jury that they had to determine only one question, and that was, if the saw-mill and machine company was fairly organized, and the sale of the property to them by Montgomery and Lund was also fair, and done without fraudulent intent, then the defendants were entitled to recover in the action, and the plaintiff is not entitled to recover.

If, on the contrary, the company was organized to defraud the creditors of Montgomery and Lund, and the property transferred to them by Montgomery and Lund, in furtherance of that fraudulent purpose, then the plaintiff was entitled to recover in this action, and that no claim was made by either Garrabrant or Lund, to any of the property.

His honor also charged the jury, in the language of Judge LOTT, on the last trial of this action:

"That the question presented on these facts was, which of the parties had the best title; and that question, under the decision of the Court of Appeals, depended upon the intent and object with which the Steam Saw-mill and Machine Company was organized; that if it was organized, the property of William Montgomery, or of William Montgomery & Co., transferred to it, and the business of the company afterwards carried on in its name, with the fraudulent purpose on

the part of William Montgomery, or of William Montgomery & Co. (then composed of Montgomery and Lund), of preventing the plaintiff from enforcing or collecting his debt, then such organization or proceeding was absolutely void as to the plaintiff, and he had the right to sell the engine in question, or at least Montgomery's interest in it, under his execution, and that his sale and purchase gave him a superior right to that of Bunce & Co., although they may have dealt with the company without notice of such fraudulent purpose or intent, and were in fact *bona fide* creditors of the company."

The defendants' counsel then requested his honor to restrict that part of the charge adopted from Judge Lott, so as to make it conform to the following part of the opinion of Judge Mullin, in the Court of Appeals in this case, viz.:

If the firm of Montgomery & Co., whose creditors were intended to be defrauded, and for whose benefit the business of the corporation was carried on, was that composed of Montgomery and Lund, the plaintiff was not a creditor of that firm; if it was the firm of Montgomery & Garrabrant, then that firm, as such, had no interest in the property transferred to the corporation, nor was it in existence, so as to be entitled to the profits of the business.

His honor refused so to charge or restrict, and the defendants' counsel then and there duly excepted.

The plaintiff's counsel requested his honor to charge the jury, that if they found a verdict for the plaintiff, they should find according to the present value of the engine in question.

His honor did so charge, and defendants' counsel then and there duly excepted.

The jury found a verdict for the plaintiff for the sum of $525.

A motion was then made by the defendants' counsel for a new trial, on the ground that the verdict was against law and evidence, which motion was denied. The General Term affirmed the judgment entered upon the order and verdict, and the defendants appeal to this court.

*A. Thompson,* for the appellants.

I. The court erred in refusing to dismiss the complaint.

It is very desirable that the principles governing this action should be speedily and definitely settled, and this continual course of trials and appeals ended. We respectfully ask the court to examine the following arguments and authorities, and decide whether, under them, the plaintiff's complaint should not have been dismissed.

We conceive that upon no evidence that has been given in this case, or that can be given, will the plaintiff be entitled to go to the jury; because,

1st. The New York Steam Saw-mill and Machine Company were regularly incorporated, and their corporate existence cannot be called in question, except in an action by the people. (26 Barb., 205.)

2d. The plaintiff does not attempt to show that the corporation was organized to hinder, delay, or defraud him; on the contrary, it was proven that he had security on the whole machinery for the payment of one-quarter of its value. And all that this court held, per Judge SUTHERLAND's opinion, was that such an organization would be void as to the person intended to be hindered, delayed or defrauded.

3d. The proof is (and the plaintiff does not deny it) that property was transferred to the saw-mill company by Montgomery and Lund, they being copartners, Montgomery owning three-quarters and Lund one-quarter. If the sale by Montgomery was fraudulent and void as to Booth, and if that is sufficient to declare the corporation void, then the partnership revived, and Booth could only sell Montgomery's interest in the property, and not the whole property.

It was so held by this court on former appeal in Judge MULLIN's opinion. (38 Barb., 574; 1 Comst., 47.)

4th. If the corporation was void, Judge MULLIN says that the rights of the partners, Montgomery and Lund, would revive, consequently Booth's purchase of Montgomery's interest would make him a tenant in common with Lund (or the saw-mill and machine company), subject to the payment of the partnership debts; one of which was the debt due to Bunce & Co.

5th. If the above position is correct, Bunce & Co. had a right to collect their debt from the property, subject to such

debt, in which Booth had purchased an interest. (2 Penn., 198; 24 Wend., 405.)

Booth could not withdraw such property from the execution of Bunce & Co., as creditors of the firm, or company. (1 Wend., 313.)

Booth, according to the decision of Chief Justice HOSMER (4 Conn., 540), took the whole property for the debt of one partner or corporator, and thereby assumed the firm's liability to their creditors, and, in the language of Judge COWEN (24 Wend., 389), Booth, as such purchaser, can maintain neither the action of trespass nor of trover against Bunce & Co. for collecting their debt.

The court will see in this case that much irrelevant testimony has crept in which it was difficult to exclude, but which evidently biased the jury.

The same thing has occurred on three trials, and consequently the jury have always found for the plaintiff, although the court above has each time reversed their judgment. This will undoubtedly occur again, and may be repeated *ad libitum* unless the principles of the case are now settled.

We therefore respectfully ask the court to examine the authorities above quoted, especially 24 Wend., 389, and either overrule them or decide in accordance with them, that the plaintiff's complaint should have been dismissed at the trial.

II. The complaint should also have been dismissed upon the testimony, because the engine in question was not part of the property alleged to have been fraudulently transferred by Montgomery and Lund to the company, but was manufactured subsequently by the company, and, as Justice MULLIN states in his opinion of case, "The corporation had carried on business after its organization, purchased property, contracted debts, manufactured engines and machinery, with which Montgomery, or Montgomery & Garrabrant had nothing to do. This property thus acquired could not be taken upon any principle of law or equity from Lund, and his creditors applied to the payment of the debts of Montgomery, or of Montgomery & Garrabrant."

Justice BROWN and Justice LOTT also, in their opinions, expressly gives as a reason why the plaintiffs could not succeed, that the engine was not in existence when the transfer was made to the company.

The plaintiff also had ample security for his debt, which was not affected or diminished by the transfer to the company, and if he was in danger of being hindered, delayed, or defrauded by the company, he should have moved at once, and thus have prevented innocent creditors of the company from becoming involved, but as he remained still for over two years after the alleged fraud, he should not now be allowed to call the transfer void, to our detriment. (1 Hill, 302; 1 Denio, 74.)

It further appears that Montgomery and Lund entertained an honest and reasonable expectation of paying all their debts, and reserved what was deemed an ample provision for that purpose; therefore this sale could not come within the operation of 2 R. S., 134, § 1. (Also see N. Y., 109.)

If this judgment is affirmed, it establishes the monstrous principle that the property of every corporation, whether banking, railroad, or manufacturing, may at any time be seized and sold upon a claim that an indebted stockholder had invested property in such corporation with intent to hinder, delay or defraud his creditors.

III. The court errred in refusing to dimiss the complaint as requested; because,

1st. The case was put to the jury to find whether the company was formed to defraud the creditors of Montgomery and Lund; and there was not a particle of proof upon which to put such a question to the jury.

The whole testimony is the other way.

2d. There was no testimony upon which to put the question whether the company was formed to hinder, delay or defraud Booth.

3d. It was error to refuse to dismiss the complaint when there was no evidence to show that the company was organized or carried on for the purpose of hindering, delaying or defrauding the creditors of Montgomery and Lund, or of Booth;

and the uncontradicted evidence showed that it was neither organized or carried on for such purpose. The fact that the jury may choose to discredit evidence not impeached and not incredible on its face, is no reason for submitting it to them. (25 N. Y., 361.)

IV. The question put to Isaac Reeve, viz., " State what representations Montgomery made to you when you were about to become a partner, about the solvency of the firm?" and the answers thereto, were erroneously admitted by the judge; because,

1st. They related to no issue between the parties.

2d. They introduced new matter that must have been detrimental to the defendants. (12 Wend., 64.)

3d. The court having admitted the testimony, the jury, of course, considered it to be relevant, and therefore the defendants were obliged to answer it, in doing which a mass of testimony was introduced upon a foreign issue, upon which the jury passed, to the neglect of the true issue.

V. The exception to the question, " How soon after these papers were executed did you commence business in your own name?" and to the evidence of the assignment from Montgomery to Grant, are well taken; because,

1st. Such acts of Montgomery could not affect the interests of the defendants as creditors; and the judge so charged. But the evidence was calculated to produce an impression on the jury unfavorable to the defendants.

2d. Montgomery's interest was a stockholder's interest only, and could not have been sold by Booth on execution. (18 How., 512; 3 Sandf., 692.)

3d. Montgomery being a trustee, could neither sell to himself or assign to others, nor suffer the property to be levied upon as against himself. (31 Barb., 641; id., 407; id., 553, and cases cited: 20 How., 199; see 38 Barb., 622.)

VI. The examination of Lawrence as to the execution in favor of Bridges, was erroneous; because,

1st. Admitting that the transfers to the company were void as to Bridges, that does not prove that such transfers were made to hinder, delay and defraud Booth. (2 R. S., 137, § 1.)

2d. Booth was secured by mortgage on property, his debt being one-quarter of the sale price thereof; therefore, no transfers could injure his security, or hinder, delay or defraud him.

3d. Booth lay still, with two notes due, from January, 1858, till late in 1859, and thereby assented to the transfer, still holding all his security, though part of his debt had been paid. (1 Hill, 302; 1 Denio, 74.)

4th. Evidence that the plaintiff's debtor was insolvent naturally had its effect upon the jury, but could not legally operate to the detriment of the defendants.

VII. The judge erred in refusing to charge as requested by the fourth, fifth and sixth requests; because,

1st. Lund was not the debtor of Booth.

If the company were formed to defraud Booth, it did not affect Lund's property, but only Montgomery's interest; the company being void, the partnership revived, and no more than Montgomery's interest could be sold. (38 Barb., 574; 1 Comst., 47.)

If it should be held that Booth bought Montgomery's interest only, and Bunce & Co. bought Lund's interest only by their several executions, then Booth became tenant in common with Bunce & Co., and one tenant in common cannot maintain an action against his co-tenant. (15 Johns., 179; 9 Barb., 500.)

2d. The Court of Appeals held that if the formation of the company was void, then the copartnership revived. If this is admitted, then Booth took the interest of Montgomery, incumbered with the firm debts, and the recourse of Bunce & Co. was necessary to the property in the hands of Booth. (2 Penn., 198; 24 Wend., 405.)

And Booth had no right to withdraw such property from the execution of the creditors of the firm. (1 Wend., 313.)

HOSMER, Ch. J. (4 Conn., 540), says, if the creditors take the property for the debt of one partner, he assumes a liability to the demands of the creditors of the firm upon him.

Justice COWEN utterly denies, in the whole of 24 Wend., 389, that an action of trespass or trover can be maintained

by the purchaser of a partner's interest against the sheriff or firm creditors, and concludes by calling it a novel remedy.

VIII. The whole of the charge, in the language of Judge Lott, is erroneous, because,

1st. The judge refused to restrict it, or instruct the jury as directed by the Court of Appeals.

2d. It is contradictory to the charge of the court, and brings in other creditors than those of Montgomery and Lund, while that part contrary to the Court of Appeals excludes Lund from any interest in the property.

IX. The judge erred in directing the jury to find the present value of the engine, because,

1st. The value of the engine, when taken, was $350, and the measure of damages is that value and interest. That, according to 26 Barb., 650, is the measure of damages for taking personal property.

2d. This action is not trover, or for detaining personal property, where the highest price may be the measure of damages. The complaint can leave no doubt that the action is for trespass.

3d. There is no evidence of any conversion on the part of the defendants McLeod or Windle, they are the sheriff indemnitors only; the action of trover cannot be maintained without such conversion. (See 5 Denio, 92.)

X. The jury found a verdict against all the evidence, and without any evidence to sustain it; and the judge erred in not granting a new trial on motion, and the General Term erred in affirming the order denying the new trial, as well as in affirming the judgment.

*R. W. Van Pelt,* for the respondent.

I. It is stated in subdivision 2d of appellants' first point, "that the plaintiff does not attempt to show that the corporation was organized to hinder, delay or defraud him; on the contrary, it was proved that he had security on the whole machinery for the payment of one-quarter of its value."

This is certainly an extraordinary statement in view of the evidence.

On January 1, 1857, Booth's claim was $4,430, $965.32 of which was due and payable on that day. The machine company was organized October 20, 1857.

The utmost value of the property covered by the chattel mortgage was $2,000 to $2,500, leaving Booth an unsecured creditor to at least the amount of $2,000.

Montgomery & Co. were in embarrassed circumstances prior to and at the time of the formation of the company. They had been sued by Bridges & Bro. on a claim of $1,100. The sheriff could not collect the execution of Bridges & Bro.

Lund expressly testified that one of the objects of forming the machine company and transferring the property of Montgomery & Co. to it, was to keep the property and make enough to pay the debts, which they hoped to be able to do.

Under the pressure of such embarrassments the machine company was organized. It consisted of five trustees, all bankrupts, namely, Montgomery, Lund, Emerson, Jones and Oaksmith.

Emerson & Co. had just failed for $20,000. They turned out some patterns to the machine company worth from $1,200 to $1,500, instead of applying them to the payment of their own debts, and for which they received $90,000 of the stock of the company, which stock they subsequently, October 21, 1858, made over to Montgomery.

Oaksmith was the assignee of Emerson & Co., and continued their business after the assignment.

He had but one share of the stock.

The machine company was organized at the suggestion of Montgomery & Co., to save the large commissions which had made the firm of Emerson & Co. so rich.

Lund had his share of the stock, one-quarter, being 480 shares of $100 each, issued in the name of his mother-in-law, Mrs. Treat, and taking one share in his own name so as to be qualified to act as trustee.

Montgomery's three-quarters was issued to his father, his wife and children, excepting one share which he had in his own name so that he could act as trustee. He was also president of the company, and had the sole charge and con-

trol of the business, which went on the same in all respects as before the formation of the company, except it was in the name of the company.

The value of all the property transferred by Montgomery & Co. and Emerson & Co., to the machine company, was less than $30,000, which constituted the entire assets and capital stock of the company.

The trustees made the affidavit required by law that the capital stock of said company ($250,000) was fully paid in on 31st October, 1857.

Montgomery, in the spring of 1859, resumed business in his own name. He put up in large letters over his place of business in Pine street, "Wm. Montgomery's Yonkers Machine Works." The machine company's sign was on the panel of the door; when the door was open (which was all the time in the spring and summer), you would have to go in the store to see it. Bunce & Co. knew all about the organization of the company.

Montgomery afterwards made an assignment of the whole concern for the benefit of his individual creditors, including the firm of J. E. Bunce & Co., and preferring them. Bunce & Co. then signed the compromise paper and consented that Montgomery should have the property surrendered to him by his assignee—so that he could carry on his business as formerly. Surely in view of such facts and a multitude of others equally significant, it would have been extraordinary if the jury had failed to discover fraud.

The fraudulent character of the machine company being thus conclusively established, the organization is swept away, and the trifling interest of Lund in the engine in question, if he had any at all, still remains in him.

On what principle of law, equity or common sense, can it be claimed by defendants that they have succeeded to this interest of Lund's, under their execution sale on their judgment against the machine company?

II. The complaint should not have been dismissed "because the engine was manufactured by the machine company," nor is such the fact according to the evidence.

The cylinder and bed-plate were on hand at the time of the formation of the company, and were worth $50 or $60.

During the existence of the machine company, $15 worth of labor was expended upon it.

The balance and great bulk of the value, $495, was put upon it by Montgomery after he had resumed business in his own name, which latter interest most clearly was subject to the plaintiff's judgment.

But the jury have found that the company was organized by Montgomery and the business carried on in its name to defraud his creditors. Consequently Montgomery and the machine company were convertible terms, or two names for the same person — and that person Montgomery. The extract cited from Judge MULLIN's opinion, could only have been written on the assumption that the machine company was a *bona fide* corporation, and not a mere fraudulent device to cover up and conceal the true ownership of the property bought, engines and machinery made, &c., which true ownership was in Montgomery.

As to plaintiff's alleged delay in assailing the machine company, on the ground of the fraud, it will be observed that his claim matured by installments; the last of $2,500 became due, January 1, 1860, and he prosecuted immediately thereafter.

III. The finding of the jury under the charge of the court establishes the fact that Montgomery intended to defraud his creditors, including Booth, by the formation of the machine company.

IV. The question put to Reeve was entirely proper. It was a part of the *res gestæ*. The issue was fraud. Montgomery was the chief conspirator. In such a case the widest latitude is given, and the acts and declarations of all the parties concerned in the fraud are admissible. ( *Woodhouse* v. *Jones*, 5 N. Y. Leg. Obs., 20.) The examination of Deputy Sheriff Lawrence as to his not being able to collect execution of Bridges against Montgomery & Co., was also proper. It was a circumstance bearing on the question of fraud, and a very significant one.

V. The action being trover, "that the defendants wrongfully took from the possession of the plaintiff and carried away a certain steam engine, the property of the plaintiff, of the value of seven hundred dollars, and converted the same to their own use," the plaintiff was entitled to recover the highest value of the property intermediate the conversion and the trial. (*Romaine* v. *Van Allen*, 26 N. Y., 309.) Consequently, it was not error for the judge to charge, that if the jury found a verdict for the plaintiff, they should find according to the present value of the engine in question. The plaintiffs were entitled to even a more favorable charge in that respect than the one given; but if it was error, the value of the engine at the time of its conversion appears also, by two witnesses, to have been $350, and the error may be corrected without going through with the form of another trial.

VI. It is extremely desirable that finality should be given to this most troublesome and vexatious case on the present appeal, if possible. It would be an act of cruelty to both parties to order another trial, which would make the fifth, and would, as a matter of course, involve another appeal to this court, because none but this court of last resort can end this case. The main question, that of fraud in the organization of the machine company, has been passed upon by three successive juries, who have each, without ten minutes' deliberation, found in the plaintiff's favor, and it is not to be supposed that any other jury will come to a different conclusion on that point, in view of the facts. The utmost that the defendants claim is but a nominal reduction of the verdict, and the costs of the action already exceed twice the amount of the verdict. The longer the case is litigated, the more complicated it will become. It never will present fewer or simpler questions than at the present time.

It is therefore respectfully submitted on the part of the respondent that the judgment should be in all things affirmed.

POTTER, J. This case may be regarded as a contest between *bona fide* creditors to secure their respective claims, in part or in the whole, from certain personal property, to wit, a steam

engine, and the question first to be determined is in whom was the title to the property at the time it was levied upon and taken by the defendants. It is conceded that the title to the engine in question, at the time of the plaintiff's levy upon it by his execution, was either in Montgomery and Lund, then lately composing the firm of Montgomery & Co., or in the corporation called "The New York Steam Saw-mill and Machine Company." The plaintiff claims the title to have been in the former, the defendants claim it to have been in the latter. This, it will be seen, became the material issue to be tried at the circuit. The organization of this company, in due form of law, was duly proved, and there was no evidence of its legal dissolution. The bed-plate and cylinder of this engine was transferred by Montgomery and Lund to this corporation, and its completion as an engine was subsequent to that time. The debt upon which the defendants' judgment was obtained was contracted by this corporation in the ordinary course of their business, and their judgment was against the corporation, and their execution was against the property of the corporation. The property, when so levied upon by the defendants, was in the possession of the plaintiff, who claimed to have made title to it under a judgment and execution, levy and sale thereunder, against William Montgomery and William Garrabrant. William Montgomery & Co., before January, 1855, was composed of said Montgomery and Garrabrant, and one Isaac Reeve. Montgomery and Garrabrant purchased out Reeve's interest, and gave him the notes upon which plaintiff's judgment was obtained in payment for Reeve's interest in the firm, Montgomery and Garrabrant continuing the firm of Montgomery & Co. Subsequently, Garrabrant sold out to Montgomery, and George D. Lund purchased an interest in Montgomery's business, and it was still continued to be carried on in the name of Montgomery & Co. Subsequently still, the Steam Saw-mill and Machine Company was organized, and Montgomery & Co. transferred their business and assets to this corporation, and Montgomery was its president and principal executive, financial and

managing agent. The plaintiff claims that the organiza-
tion and conducting of this corporation was a fraudulent
device of Montgomery & Co. to hinder, delay and defraud
their creditors, and that, as to the plaintiff, the said organiz-
ation, and acts of user under it, were nullities, being fraud-
ulent and void. On the trial the plaintiff offered evidence
tending to prove this fraudulent device. The evidence was
sufficient in strength to make it proper to have it submitted
to the jury; and the learned judge charged the jury that
they had to determine but one question, and that was, that
if this corporation was fairly organized, and the sale of the
property to them by Montgomery and Lund was also fair
and done without fraudulent intent, the defendants were
entitled to recover; if, on the contrary, the company was
organized to defraud the creditors of Montgomery and Lund,
and the property was transferred to them by Montgomery
and Lund in furtherance of that fraudulent purpose, the
plaintiff was entitled to recover. This charge, I think, was
entirely sound; no exception was made to it by either party.
The jury found their verdict for the plaintiff. This, it ap-
pears to me, is conclusive upon this feature of the case. It
is insisted that this corporation, being regularly organized,
and the defendants their *bona fide* creditors, their corporate
existence cannot be called in question, collaterally, and thus
destroy the defendants' claim against them; that only the
people of the State have a right to raise the question of their
corporate rights. This argument is not sound as applicable
to a case of fraud. As we have had occasion to repeat in
another case, " it is a principle as old as the law of morals,
and which has been engrafted into the law of equity and
justice, that good faith is the basis of all dealing, and that
every description of contract, and every transfer or convey-
ance of property, by what means soever it be done, is vitiated
by fraud. Whether the contract be oral or in writing; whe-
ther executed by the parties with all the solemnities of deeds
by seal and acknowledgement; whether in form of the judg-
ment of a court, stamped with judicial sanction, or carried
out by the device of a corporation organized with all the

forms and requirements demanded by the statute in that regard, if it be contaminated with the vice of fraud the law declares it to be a nullity. Deeds, obligations, contracts, judgments, and even corporate bodies may be the instruments through which parties may obtain the most unrighteous advantages. All such devices and instruments have been resorted to to cover up fraud, but whenever the law is invoked all such instruments are declared nullities; they are a perfect dead letter; the law looks upon them as if they had never been executed. They can never be justified or sanctified by any new shape or cover, by forms or recitals, by covenants or sanctions which the ingenuity, or skill, or genius of the rogue may devise." The effect of this finding of the jury is that this corporation was a device resorted to by Montgomery and Lund to hinder, delay and defraud their creditors. As between the plaintiff and Montgomery and Lund the plaintiff had a right to disregard the corporation as a void thing, and resort to the property of Montgomery to satisfy his demand. Had the defendants, as *bona fide* creditors of this corporation (which was a valid corporation as to them), obtained a lien by a prior levy under their judgment, it would have presented a different question. Their equities were, doubtless, equal to the plaintiff's — it was so held when last before it was in this court — but the plaintiff was prior in time with his lien. "*Qui prior in tempore, potior est in jure.*"

So, too, it is urged that if the transfer by Montgomery and Lund to the corporation was fraudulent, and the corporation void as to the plaintiff, then the partnership interest of Lund revived, and the plaintiff could only sell Montgomery's interest in the engine, which was three-fourths. This is, doubtless, true, but if true it cannot help the defendants. They are not the creditors of Lund but of the corporation. They could not take Lund's interest in this engine upon an execution against the "Saw-mill and Machine Company." The plaintiff had a right to take the engine upon his levy if it was the property of Montgomery and Lund, and is accountable to Lund only for his interest in it, or to his creditors in a proper form of action. Lund is not a party to this action

—he was not a party to the defendants' judgment — and the defendants are not in a situation to defeat the plaintiff's action upon his rights.

Another point urged why the plaintiff should have been nonsuited is, that the engine in question was not in existence when Montgomery and Lund transferred their assets to the corporation. The undisputed evidence is, that the bed-plate and cylinder were in existence and were transferred among the assets. These were worth, at that time, $50 or $60. While the corporation as such was being carried on, about $15 of work was added to the engine; and after Montgomery commenced again in his own name, he completed it. It was therefore the subject of levy, upon execution, by a creditor of Montgomery, upon the facts as found by the jury. So, too, it is urged that the plaintiff's claim was against the firm of "Montgomery & Co.," as represented by "Montgomery and Garrabrant," and not against "Montgomery & Co.," as represented by "Montgomery and Lund," who made the transfer to the corporation. This also appears to be true as a matter of fact; but the finding of the jury still is, in effect, that Montgomery and Lund made the transfer, to hinder, delay and defraud their creditors; that Montgomery's interest in the engine, consequently, was always the subject of levy by his creditors, and the same answer again returns. Neither Lund nor Garrabrant are parties here to complain, and the defendants are not in condition to defend the rights of those persons.

The history of this case shows, that besides four trials at circuit, and four reviews in the Supreme Court, it has been twice before in this court. On the last review of it in this court, the learned judge who wrote the only opinion that we have seen, among other things, said: "If the Montgomery & Co., whose creditors were intended to be defrauded, and for whose benefit the business of the corporation was carried on, was that composed of Montgomery and Lund, the plaintiff was not a creditor of that firm; if it was the firm of Montgomery & Garrabrant, then that firm, as such, had no interest in the property transferred to the corporation, nor was it in existence so as to be entitled to the profits of the business." The

defendant's counsel asked the judge, at the last trial, so to modify his charge, as to adopt the language above cited from the opinion written in this court. His honor refused so to charge or modify, and the ·defendant excepted. In this refusal, the learned judge, at the circuit, was clearly right. The facts upon the last trial were not only changed, so that the charge as requested would have been for that reason inappropriate, but the proposition of the learned judge, who wrote the opinion from which the citation is made, was not adopted by this court as law, and the case was sent down for a new trial upon one, and an entirely different proposition from that above cited.

We have thus disposed of all the points raised in the case, but that of an exception taken to the ruling of the judge, on the admission of evidence upon a question put to the witness, Reeve, the payee in the note upon which the plaintiff's judgment was obtained. The question was, "State what representations Montgomery made to you, when you were about to become a partner, about the solvency of the firm?" To this there was a general, but no specific objection, and the objection was overruled, and the defendant excepted. Was the admission of this evidence proper for any purpose? Reeve was one of the first copartners of Montgomery. He had purchased an interest in the business, as was claimed, upon Montgomery's representations of his solvency, and of the success of the business. To prove Montgomery's condition of past, continued and present insolvency, and the various expedients resorted to by him to obtain means from others, from time to time, to sustain him in business, for the purpose of establishing a fraud, or a succession of frauds, connected with, and culminating in the fraud which was then the main issue to be tried, I think the admission of this evidence was not error. While fraud is to be proved, and not inferred, it may be proved by circumstances, and by a train of connected circumstances leading to the main result. Upon the whole case, I am not able to see any error that requires it to be sent back for a new trial. I think the judgment should be affirmed.. Judgment affirmed.