FRANK J. CREGG, JR., as Trustee of JULIAN S. BROWN, a Bankrupt, Plaintiff, *v.* ELECTRI-CRAFT CORPORATION and Others, Defendants.

Supreme Court, Onondaga County, February 28, 1941.

*A. J. & A. P. Cot* [*A. J. Oot* of counsel], for the plaintiff.

*LaFayette Costello*, for the defendant Julian S. Brown.

*Sidney B. Coulter*, for the defendants Electri-Craft Corporation, Robert S. Park and Frank L. Stimson.

MOREHOUSE, J. This action in equity has been brought by Frank J. Cregg, Jr., as trustee of Julian S. Brown, an adjudged bankrupt, to recover all of the assets and property of the defendant Electri-Craft Corporation, including a deposit with the defendant The Merchants National Bank and Trust Company of Syracuse, upon the ground that the corporation was formed by the bankrupt as a fraud upon and to hinder and delay his creditors, to conceal his property and effects from them, and as a cloak to cover his individual operations and property. The plaintiff also seeks to set aside as spurious and void a judgment of $44,465.26 recovered by the defendant Julian S. Brown against the corporation, subsequent to his bankruptcy, for alleged services as its president. The defendants Robert S. Park and Frank L. Stimson are, with Brown, the sole stockholders of the corporation.

A certificate of incorporation of Electri-Craft Corporation was filed in the office of the Secretary of State October 18, 1933, by Julian S. Brown, Robert S. Park and John M. Ellis, who were named therein as directors for the first year. Nothing was paid.

by Park or Ellis for the single share allotted to each, nor was any certificate ever issued to Ellis, the share intended for him being subsequently delivered by Brown to the defendant Stimson. All moneys which were ever paid into the corporation came as gifts from Brown, and nothing in money or service was ever contributed by any stockholder. No stock record book was kept, and such books and records of the corporation as may have existed were not made available upon the trial of this action as their existence or whereabouts has been a subject of query for some years past. The business of the corporation was the purchase of manufactured boat hulls, which were then finished and equipped with electric motors built or assembled by the corporation, and was carried on in a plant at East Syracuse from about the time of incorporation into 1936, with some continued activity until the fall of 1939. No salaries were paid to any of the officers or directors, there were no dividends, and little, if any, profit ever resulted from the activities of the corporation.

Over the objection of counsel for the defendants, there were received in evidence excerpts from testimony of the defendants Park, Stimson and Brown, theretofore taken before a special master in a proceeding in bankruptcy against Brown. An analysis of this testimony leads to the conclusion that it is of doubtful competency, and unnecessary for a proper determination of the issues involved herein. For these reasons, it is stricken from the record, and only the remaining and competent evidence will be considered hereinafter.

In October, 1933, Julian S. Brown was heavily involved and in serious financial difficulties. In April, 1932, an involuntary petition in bankruptcy had been filed against him, a proceeding which continued pending until January, 1936. In the interim, his property was in receivership under an order of the United States District Court, which also restrained his creditors from prosecuting their claims. During this period, many and varied proceedings were taken and had in the Federal courts concerning Brown's business ventures and the status of his creditors. It is not entirely clear whether he was actually insolvent during any of this period, but it is patent that he was being harassed by his creditors, that his financial affairs were in a turmoil, and that he was thereby seriously handicapped in his individual and personal activities.

The evidence shows that at the date of the Electri-Craft incorporation, Brown was indebted to approximately thirty-five creditors in a total amount of upwards of $330,000. The defendants contend that the claims of several of these creditors in substantial amounts had not matured or finally accrued at this time, but the proof

is that all of the obligations had been incurred previously, except for one instance where some of the service rendered extended for a period beyond the date of incorporation. If these creditors remained quiescent, it is reasonably inferable that it was solely on account of the restraining order of the Federal court, effective since April, 1932, or because of anticipation of settlement encouraged by the circumstance that some of the creditors were being paid. Ultimately, in January, 1936, the proceeding was dismissed over the objection of Brown who had withdrawn his earlier opposition and had himself requested an adjudication of bankruptcy. Upon a new involuntary petition in bankruptcy by Brown's creditors, filed May 22, 1936, he was adjudged a bankrupt and subsequently the plaintiff was, as of that date, vested with the title to all of the property and assets of Brown, and by operation of law, with the rights, remedies and powers of a judgment creditor holding an execution returned unsatisfied.

From the time of its inception, the corporation and all of its activities, with its money and property, were solely and absolutely under the exclusive control and domination of Brown. There is no record of any legally held election or meetings of officers or directors, except for the directors named in the certificate. No stock record book was kept and what, if any, other books and records ever existed is a matter for conjecture. Annual reports were not filed as required by law, and there is no evidence of compliance with any other statutory requirements for the conduct of corporate business. Between June 14, 1933, and May 23, 1936, Julian S. Brown personally, from his own funds, paid into the corporation or for its benefit a total of $67,758.20. None of these payments was set up upon corporate books or otherwise as loans, but all were paid in as gifts from Brown. They constituted all of the money which was ever made available to the corporation except that received from sales of its finished product, the profits from which were comparatively negligible. Brown's gifts consisted of payments direct to the corporation, as well as the payment by him personally of many of its obligations for labor, materials and other expenses of operation. Its activities were carried on in a building owned by him, for which no rental was paid or charged. There is no evidence that any one, save Brown, ever had any part in the direction or management of the finances or operation of the corporation and it was unquestionably his creature, conceived and nourished by him alone.

If the situation were otherwise than as above outlined, the burden was upon the defendants to establish the fact. The charge against them is in the nature of fraud, and as was stated in *Sabatino* v. *Cannizzaro* (243 App. Div. 20, 22), " The law appears to be well

settled that where a plaintiff cannot show an actual fraudulent intent on the part of the defendants, he establishes a *prima facie* case merely by proof of two facts, namely, that a voluntary conveyance was made without any consideration and that when made the grantor-debtor was indebted to the plaintiff." These essential facts were established by the plaintiff's proof, and so cast the burden of explanation upon the defendants.

A corporation is a legitimate and necessary instrumentality for the conduct of business. It allows participation in large enterprises by small investors, and permits individuals to chance the uncertainties of industry and commerce with a limitation of personal liability. To this extent, and under ordinary circumstances, it affords a proper stability alike to its shareholders and creditors who participate with a full knowledge of the limitations of liability accruing to the former and imposed upon the latter. Thus, the law has created something the components of which are natural persons, but whose aggregate is artificial, and has frequently been referred to as the " corporate entity " which actually has no being and is fictitious in character. This is sanctioned by law, and has been recognized by the courts as a thing separate and apart from the individual, even though the corporation is actually owned and dominated by a single person. However, where illegal, improper or fraudulent motives inspire the formation of the corporation, or permeate its activities, this artificial character loses its sanctity, and the courts will, as one writer puts it, " pierce the veil of corporate entity " and intervene to establish and protect the property rights of those who might otherwise be defrauded. " While the courts of law strictly observe the fiction of corporate entity, there has been for years a growing indisposition to permit corporate entity to be employed either as an instrumentality or as a cloak for fraud or for successful evasion of the law." (*Quaid* v. *Ratkowsky*, 183 App. Div. 428, 432, with numerous cited authorities.)

In *Booth* v. *Bunce* (33 N. Y. 139, 156), which was not in equity, but an action at law, the obligation of a creditor was enforced against corporate assets as opposed to the claims of a creditor of the corporation, and the court said: " It is insisted that this corporation, being regularly organized, and the defendants their *bona fide* creditors, their corporate existence cannot be called in question, collaterally, and thus destroy the defendants' claim against them; * * *. This argument is not sound as applicable to a case of fraud. As we have had occasion to repeat in another case, ' it is a principle as old as the law of morals, and which has been engrafted into the law of equity and justice, that good faith is the basis of all dealing, and that every description of contract * * * is vitiated by fraud. Whether the contract be oral or

in writing; * * * whether in form of the judgment of a court, stamped with judicial sanction, or carried out by the device of a corporation organized with all the forms and requirements demanded by the statute in that regard, if it be contaminated with the vice of fraud the law declares it to be a nullity. Deeds, obligations, contracts, judgments, and even corporate bodies may be the instruments through which parties may obtain the most unrighteous advantages. All such devices and instruments have been resorted to to cover up fraud, but whenever the law is invoked all such instruments are declared nullities; they are a perfect dead letter; the law looks upon them as if they had never been executed.' "

Recently, in the action of *Newark Fire Ins. Co.* v. *Brill* (7 N. Y. Supp. [2d] 773, 779) this court, through Mr. Justice HAMMER, said: " If the corporation was organized to defraud a creditor and property was transferred by the debtor to the corporation in furtherance of that purpose, the creditor, or creditors, would be entitled to recover. Even if a corporation was regularly organized and has *bona fide* creditors, the corporate existence may be called into question where it is shown that the corporation was organized to defraud a creditor, or creditors, of the organizer who denuded himself of his property in furtherance of his fraudulent scheme."

A uniform rule has been promulgated by courts of equity to the effect that the corporate entity will be disregarded as a fiction where justice requires. (*Goss & Co.* v. *Goss* [*No. 2*], 147 App. Div 698, 702; *Anthony* v. *American Glucose Co.*, 146 N. Y. 407; *Garrigues Co.* v. *International Agricultural Corp.*, 159 App. Div. 877, 880.)

Counsel for Electri-Craft contends that the rights of its creditors have intervened to such an extent that it would be inequitable to denude it of assets and so deprive the creditors of any means for collection. Heading the list of creditors is Julian S. Brown in person, with a judgment for $44,465.26, obtained against the corporation docketed September 8, 1939, for services alleged to have been performed from May 22, 1936, at the rate of $15,000 per year, which it is claimed were awarded at a meeting of the board of directors September 11, 1937 It is further claimed that the corporation is indebted to the Federal Deposit Insurance Corporation for $1,400 for rent of its office in the City Bank Building. The claims of other creditors mentioned, none of which has been placed in judgment, aggregate less than $100. The validity of the Brown judgment has been directly questioned, and seems to be in violation of a restraining order of Judge BRYANT granted June 16, 1939. It would be fallacy to consider equities favorable to Brown in connection with this judgment obtained under the circumstances disclosed, and the claim for office rent covered a recent period when the corporation was in no need of an office.

Under the authority of *Booth* v. *Bunce* (*supra*) these claims, even though *bona fide*, should not interfere with the equities as between the plaintiffs and the defendants. The court stated: " Had the defendants, as *bona fide* creditors of this corporation * * *, obtained a lien by a prior levy under their judgment, it would have presented a different question. Their equities were, doubtless, equal to the plaintiff's * * * but the plaintiff was prior in time with his lien." The trustee, as of May 22, 1936, became vested with all the rights, remedies and powers of a judgment creditor holding an execution duly returned unsatisfied, and thus enjoys an established priority over any of the corporate creditors.

Consideration of the motives behind Brown's formation of Electri-Craft Corporation must be with conception of the fact that the outcome of the involuntary bankruptcy proceeding pending against him was then in doubt. If he were successful in his efforts to resist an adjudication then his property, including any fresh assets, would all be subject to the demands of his creditors. This being the case, what more natural for one with his prior unfortunate business experiences than to seek a screen for his future operations and a safe place for funds then in hand, or anticipated, which he did not wish to pay to his creditors. That such was his purpose in the formation and operation of the corporation is apparent from the situation then existing, his exclusive control and complete domination of its affairs, his indiscriminate gifts of personal funds without the creation of any corporate obligation, the failure to organize and carry on business in an orthodox manner, non-compliance with any statutory corporate requirements save the filing of the original certificate, and many other irregularities. This state of affairs, unexplained, coupled with all of the other surrounding facts and circumstances, compels the conclusion that Electri-Craft Corporation was created and operated by Julian S. Brown to hinder, delay, and defraud his creditors. Equity does not countenance the use of the corporate entity for such purposes, and creditors as here represented by the plaintiff are consequently entitled to all of the corporate assets, money and property.

Inasmuch as a decision in favor of the plaintiff upon his first cause of action to reach the assets of the corporation will entirely strip it of all property and assets, it seems that any discussion or decision of the second cause of action to set aside the judgment of Julian S. Brown would be academic and valueless to the plaintiff.

In accordance with the foregoing, judgment is directed in favor of the plaintiff, awarding to him the title and possession of all of the property and assets of the defendant Electri-Craft Corporation, including deposit with defendant Merchants National Bank and Trust Company, with appropriate incidental relief.