Under a will directing the segregation of testator's estate into several trust funds, a contention in the executors' judicial settlement that no trust estate was erected, because there had been no separation by setting apart specific property for each trust, cannot be sustained, where the estate consisted largely of securities which the executors deemed wise to retain instead of converting into cash for reinvestment, and none of the beneficiaries suffered by the technical violation of the will.

2. SAME—JUDICIAL SETTLEMENT WITH EXECUTORS.

On a judicial settlement of executors' account, the objectors cannot complain of a contract by the executors with a bank, of which one of the executors was president, whereby such executors purchased certain government bonds from the bank, for which they gave their note, allowing the bank to retain the bonds as security, with the understanding that the bank was to repurchase the bonds, paying a stipulated price, where the transaction was intended to save the estate from taxation, and resulted in direct gain to the estate.

3. SAME—DEPOSIT OF FUNDS IN BANK—INTEREST.

· On a judicial settlement of executors' accounts, they cannot be charged with interest on deposits kept in a bank of which one of them was president, where the account was kept as it would have been in any other bank, and no more money was kept on deposit than the proper execution of the trusts created by testator's will required.

4. SAME—INVESTMENT IN BONDS—INCOME—DIMINUTION IN PREMIUM.

Where a testator creates certain trust funds, intending that the entire earnings of such trusts shall be available as income, and the executors have invested the funds in bonds at a premium, which is lessening as maturity of the bonds approaches, no reservation of the income as a sinking fund, to compensate for the wearing away of the premium, can be made by the executors to counteract the diminution in such premium.

5. SAME—COMPENSATION.

Code Civ. Proc. § 2730, regulates commissions of executors, and directs that on settlement of an executor's account the surrogate must be allowed not exceeding a certain per centum for receiving and paying out all sums not exceeding $1,000, etc., and provides that, if the personal estate above the debts exceeds $100,000, each executor, if there are not more than three, shall be entitled to full compensation on principal and income allowed to a sole executor. Held, that where a testator appoints three executors, and directs the investment of his estate, having personalty exceeding $100,000, in trust, the income to be paid to certain beneficiaries until the happening of the event terminating the trust, when the residue is to be distributed, each executor, on a judicial settlement

of the accounts before the trust estate has terminated and the principal distributed, but after it has been invested for several years, is entitled to receive one-half the commissions allowed for receiving and paying out, which is to be computed on the entire principal which came into their possession as trustees, and the commissions for receiving and paying out the income of the trust estate, subject to diminution for any failure to deduct the same when payments were made, but in making such computations the realty of which testator died seised, and which remains unsold, cannot be included.

6. SAME—FAILURE TO DEDUCT COMMISSION ON INCOME—RATIFICATION BY RECIPIENT OF RESIDUE.

Where the executors fail to retain their commissions from the income of a trust estate, the recipient of the principal, receiving it under an order directing the retention of a sum to cover the executors' commissions, ratifies the order, and precludes an objection to the allowance of such commissions to the executors on a judicial settlement of their accounts.

Appeal from surrogate's court, Wayne county.

Proceeding in the matter of the judicial settlement of the accounts of Charles D. Johnson and others as executors and trustees of the will of Carlton H. Rogers, deceased. From a decree of the surrogate's court adjusting and settling the accounts, Clara H. Radcliffe and others appeal. Modified.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Ezekiel Fixman, for appellant Clara H. Radcliffe.

William A. Munford, for other appellants.

Pliny T. Sexton, for respondents.

SPRING, J. Carlton H. Rogers died at Palmyra, in said county, August 18, 1884, leaving, him surviving, no widow, but a married daughter, the appellant Clara H. Radcliffe, his only heir at law and next of kin. Mrs. Radcliffe has three sons, also appellants, who were minors at the time of the decease of their grandfather, but have since attained their majority. Mr. Rogers left a last will and testament, whereby he named the three respondents his executors and trustees. The will was admitted to probate, and letters testamentary issued August 29, 1884. The material parts of the will, so far as they pertain to this controversy, are as follows: (1) There is a direction to his executors to set apart $20,000 out of his personal estate, and to use the income, "or so much as in their judgment may be necessary, to the support and maintenance" of my widowed aunts, Sophia Allen and Prudence E. Thayer, "as long as they, or either of them, shall live," and at their death said sum should become a part of the residuum of his estate. (2) He gave to his daughter for life $50,000, and directed his executors to set apart and invest that sum, "and pay the income thereof to my said daughter during her life." Upon her death, said sum was to be paid to the children or descendants of his said daughter. After other bequests, which are unimportant in the controversies now pending, he provided for the erection of a trust, directing his executors to divide the residue of his estate "into as many equal shares as there may be children of my said daughter, Clara H. Radcliffe,

living, and deceased leaving descendants, and to hold one of the said shares in trust for each of the said living children, and, in case there shall be descendants of a deceased child, to divide the share which would be held for such deceased child, if living, into as many subshares as there are such descendants, and to hold one of such subshares in trust for each of them." The executors were also directed to keep these shares invested, "and to collect the rents, incomes, and profits thereof"; to apply whatever of the income was necessary for the education and maintenance of each of her children "until he reaches the age of 21 years, and then to pay over to him any accumulation of income arising upon the share or subshare held in trust for him"; to pay over "the entire income" accruing after his majority until he reaches the age of 25 years, and then to pay over one-half of the principal sum to him, and the income thereafter on the remaining one-half until he is 30 years of age, when he is to receive the balance of his bequest. The trustees were empowered "to withhold the payment of any part of the principal" if, by reason of the improvidence of any of these ultimate beneficiaries, it was deemed judicious by said trustees so to do.

It is apparent that the testator is seeking to insure to his daughter and her children the income of his estate, and deemed it better policy for them to intrust its management to trustees rather than to his daughter. This scheme of the testator, evidently conceived with caution and circumspection, and with the obvious purpose to relieve his daughter from the burden of looking after a large property, and for which she doubtless had no training, resulted in discord and disagreements, and this expensive litigation between the recipients of his bounty and the men he selected to guard his property for their welfare. The creation of trust estates under the domination of strangers to the exclusion of the near relatives is quite apt to engender bad feeling, and particularly where the beneficiaries include minor children who have little conception of the value of money, or of the wisdom of economy in its use. This case affords another illustration of that melancholy fact.

The executors immediately entered upon the discharge of their duties, and the gross principal of the estate committed to them amounted to $245,572.87. The interest on $20,000 was paid to the widowed aunts until the death of the survivor of the two, August 15, 1890. During the pendency of the proceedings in the surrogate's court it was insisted by the daughter that this bequest directing the trustees to dispose of the same after the death of the surviving aunt was void, as violative of the statute against perpetuities, and the surrogate so held, and this sum, therefore, did not become a part of the residuary estate of the testator, but passed to Clara H. Radcliffe as next of kin of the testator, and was paid to her by the executors. No accounting was had by the executors or trustees until the present proceeding, which was set in motion by the daughter, but, upon the return of the citation upon their petition, a citation for judicial settlement was filed, and all parties interested were brought in, and the account of the exec-

utors and trustees was filed, and objections thereto interposed. The contest extended over a period of six years, and has been prosecuted with the usual virulence and bitterness. The decree of the surrogate's court is a marked vindication on the conduct of the executors and trustees, even to the most minute detail. That they gathered together the scattered securities composing the property of the testator, and reinvested the same with foresight and good judgment, and that no losses are chargeable to any delinquency or lack of caution on their part, is clear. They are business men of experience and ability, and there is no suggestion of any fraud or want of integrity in their conduct in their long trusteeship, but the controversies have arisen over facts which the trustees do not controvert, and which relate largely to two or three transactions. The parties appealing, by stipulation, found at pages 416 and 417 of the printed record, have limited the questions to be reviewed on this appeal to five, and we will consider them in the order in which they are recited therein.

1. It is contended that no trust estate was erected, because there was no separation of the fund by setting apart specific securities or property for each trust and keeping each intact. That there was no division for each particular trust is true. The property of the testator consisted largely of securities, and it was deemed wise by his executors to retain such of these investments as were well selected, instead of converting them into cash, and running the hazard of reinvesting. Among other securities, there were about 150 mortgages for small sums on Western farms, extending over several states. In view of the depressed state of the farming business in these states, it was a slow and difficult process to convert these securities into money. The executors, therefore, did not proceed to foreclose, but, by tact and careful coaxing, managed to convert the greater part of them into money. No attempt has been made to adhere to the strict letter of the will in the segregation of these trusts, but the property was kept invested, and the income was distributed as if there had been a division into the trusts contemplated by the will. The trusts therein provided for were to terminate in the three grandsons, and the chief, intermediate trust fund was for the benefit of their mother; and, while there was a technical violation of the will, it is not pretended that any of the beneficiaries have suffered by this omission of the respondents. The only practical cogency to this failure arises over the subject of the commissions of the respondents, and the effect upon that branch of the case we will treat of later.

2. The next point of attack is what has been termed the "Government Bond Contract." Early in the administration of the estate considerable sums were paid to the executors, and deposited in the First National Bank of Palmyra. The executors found difficulty in obtaining satisfactory mortgage securities, and, in addition to this, were confronted with a purpose on the part of the assessors to place this large personal estate upon the tax roll. It seems the testator had been able to elude the visitations of the taxgatherer to a very considerable degree, and these executors, the chief of whom is a

wealthy man, were desirous to shield the estate from what they termed an unequal assessment. They accordingly, on April 14, 1885, entered into a written agreement with said bank whereby they agreed to purchase $100,000 par value of United States government bonds, maturing in 1907, and bearing interest at 4 per cent. The executors contracted to pay for these bonds $121,500, and which was the market price the day the agreement became operative. The sum of $21,500 of this purchase price was paid in cash, and for the residue the executors gave their note to the bank for $100,000, due on demand, and bearing interest at the yearly rate of $3^3/_{10}$ per centum, payable quarterly, and which was precisely the rate the bonds would net the executors. By their agreement, this low rate of interest was to continue on the amounts unpaid until said indebtedness was fully extinguished. The bank further agreed to repurchase said bonds, at the option of the executors, and pay therefor the same price which they had paid the bank. This transaction continued along until July 7, 1892, when the bank repurchased the bonds, paying therefor the price stipulated, although the market price at that date was $1.16¾, and the executors reinvested in bonds at the latter rate, and were the direct gainers by this change of over $4,000. In addition to this direct benefit, the executors managed to evade the taxgatherer to a large extent, and while this aspect of the inducement which led to the purchase may not meet commendation, and is against public policy, the beneficiaries cannot condemn the pecuniary advantage which accrued to them. This transaction meets with severe criticism from the appellants. The rule is invoked that it was the duty of the executors to invest in real-estate securities or in state or government bonds. The executors were unable to make investments in the first class of securities, and while the bonds were not in form transferred to them, but retained by the bank as security for the demand note of the executors, yet, in effect, it was a purchase of the bonds. It is claimed the executors exceeded their authority, as the contract was executory in its nature, and they had the mere promise of the bank. It was treated as a sale, and it was a repurchase by the bank. It is the refinement of reasoning, however, to speculate over the agreements now, as they have been terminated, not only without loss, but with profit to the estate. Again, it is urged, as Sexton was president of the bank, he had no right to contract with himself. Had this transaction resulted in loss to the estate, this would have been more than an academic question. But as he was careful to require the bank to agree to repurchase the bonds at the price paid, and the interest exacted on the notes was not greater than the bonds, even at the premium paid, would net to the holder, he was shielding the estate from any loss. The authorities cited by the counsel for the residuary legatees condemning the practice of an executor who puts himself in a position adverse to his fiduciary relations, or who makes profit out of his trust estate, or contracts with himself, enunciate fundamental principles. It is apparent, however, that in making this purchase the respondents were aiming to conserve the estate, and the outcome has vindicated their forecast and discretion. While technically they may come within

the letter of the criticism urged, they acted for the best interests of the beneficiaries, and their departure from the canons governing trustees does not cry out for any punishment upon them.

3. It is claimed that the executors should be charged with interest on moneys which they kept in open account in the said bank. This estate, as has been said, aggregated over $200,000, and the executors necessarily had at all times moneys on deposit. Early in the performance of their duties the sums were larger than during the latter years preceding the filing of their first account. We think, however, the amount was not larger from quarter to quarter, than a judicious management of the property justified. They were not able at all times to make satisfactory investments, but seem to have been vigilant and painstaking in their endeavors to keep the fund earning an income. Mr. Sexton was president of the bank, and the owner of 9,960 shares of the 10,000 shares which made up the enormous capital of this country bank. If a profit inured to the bank, he, of course, was its chief recipient. The testator had kept his account with this same bank. No interest was paid by it on open accounts, and this account was therefore treated the same as that of any other depositor. It does not follow because an executor is the owner of stock in a bank that he is forbidden from keeping any of his trust funds therein. The rule prohibiting a trustee from making profit out of the fund committed to him is to be given a reasonable construction. In the modern method of doing business, one who is the custodian of the funds of another is expected to keep them in a solvent bank or trust company. If some measure of profit incidentally accrues to him because of his ownership of stock in the bank, he ought not to be mulcted on that account. If the executors kept no more money on hand than the proper execution of their trust required, then the beneficiaries should not complain. If the account was kept substantially as it would have been in any other solvent bank in Palmyra or Wayne county, under a proper management of the fund, then the executors have performed their duty. The bare fact that Mr. Sexton was both executor and chief owner of the bank cannot fairly be made the pretext for punishing him, where no wrong has been done. The beneficiaries who are fruitful in the invocation of equitable principles must be fair themselves. As is said in Booth v. Bunce, 33 N. Y. 156, cited by the counsel for the Radcliffe children, "good faith is the basis of all dealing." If the executors trench on that rule they should be vigorously dealt with. In Price v. Holman, 135 N. Y. 124, 32 N. E. 124, the court announces a far more lax rule at page 133 than need be applied in this case. It says:

"In Rapalje v. Hall, 1 Sandf. Ch. 399, it was held that a trustee is not to pay interest, even simple interest, solely for the reason that he deposits the trust moneys indiscriminately with his own, nor because he makes use of them in his own business; that there must be superadded a breach of trust,— a neglect or refusal to invest the fund at the time or in the mode which the trust instrument or the law itself has pointed out."

This was cited approvingly in Re Nesmith, 140 N. Y. 609, 617, 35 N. E. 942.

As a counter consideration, it is to be noted that the bank furnished, without charge, the office, stenographer, and whatever aux-

iliaries were necessary for the executors to transact their business.

We have gone over the itemized statement, showing these deposits, and we do not find that they exceed what the executors would be expected to have in their custody awaiting investment. They are charged with caution in the selection of securities, and possess a large discretion in the discharge of their duties. It was inevitable that they should have moneys on hand at all times, and unless they have abused their discretion, and unwisely kept moneys idle, the court will not interfere.

4. The intention of the testator apparently was that the entire earnings of the trust funds should be available as income. The trustees purchased bonds in 1892 at a premium, and as the day of their maturity approaches the premium lessens. The trustees have held back quarterly from the accruing income a sum deemed adequate as a sinking fund to compensate for this "wearing away" of premium. At the time this policy was adopted the authorities as to its propriety were conflicting. Since then the court of appeals, in McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230, in a very elaborate opinion, have discountenanced this inroad upon the income, which the testator intended wholly for the benefit of his beneficiaries from year to year. In the same line, and where there was a grievous attempt to subcontract from the income of an only daughter, is In re Hoyt, 160 N. Y. 607, 55 N. E. 282. These authorities are decisive of the question, and the decree must be modified by requiring that no reservation of income shall be made to counteract the diminution in the premium of the bonds.

5. The last subject contained in the stipulation which is up for review is that of commission to the respondents. The personal estate above the debts being in excess of $100,000, each of the three executors "is entitled to the full compensation on principal and income allowed herein to a sole executor" (Code Civ. Proc. § 2730), and the surrogate's court in its decree allowed them accordingly. By the will of the testator, all of the property, except a few general and specific bequests, was directed to be invested and controlled by the respondents, as trustees for the various purposes directed in the will. It was the obvious intention that these several trusts should be erected at once, and, while the executors did not cleave the property into as many trusts as the will designed, yet, in effect, that course was pursued, as the income, from the outset of the administration of the estate, was paid in full compliance with the terms of the will, and no injury has resulted to the beneficiaries by managing the fund as a unit.

As was said in Blake v. Blake, 30 Hun, 469, at page 471:

"The actual division of the estate into five parts is not necessary to initiate the trust. It was for the mutual benefit of all that the estate was kept together, and no one objeced at the settlement that there was no actual division. Legally, it is divided. The shares are separate, and each gets his proper income therefrom."

And in Schermerhorn v. Cotting, 131 N. Y. 48, 29 N. E. 980, the court say, at page 61:

"Income and principal, given in equal shares out of one fund, kept in solido for mere convenience of investment, may be severed, and independent trusts

created for the several beneficiaries, and thus the shares and interest will be several, even though the fund remain undivided."

The will clearly distinguishes between the executorship and the trusteeship, and that is the test in determining, where the same person is both executor and trustee, whether he is entitled to commissions in both functions. Laytin v. Davidson, 95 N. Y. 263; In re Curtiss, 9 App. Div. 285–291, 37 N. Y. Supp. 586, 41 N. Y. Supp. 1111; Jessup, Surr. Prac. p. 1326.

It is claimed that the trustees are not entitled to any commissions as trustees until they have been discharged as executors, and undoubtedly it is the more orderly practice to terminate the one relation before the other begins, but the rule is not an unvarying one. Hurlburt v. Durant, 88 N. Y. 121–127; In re Underhill, 35 App. Div. 434, 437, 54 N. Y. Supp. 967, affirmed in 158 N. Y. 721, 53 N. E. 1133.

The trustees paid to the widowed aunts the income of the $20,000, which the will directed to be invested for their benefit, until the death of the last survivor, and when that event occurred, and thereafter, it was treated as part of the residuary trust estate until the decree of the surrogate's court adjudging the trust was invalid. During the lifetime of the life beneficiaries the trustees failed to retain their commissions from the income, and that is true as to other payments of income, and the contention of the appellants is that this conduct of the trustees is equivalent to a waiver of this compensation. That seems to be the trend of the authorities. Spencer v. Spencer, 38 App. Div. 403–412, 56 N. Y. Supp. 460; In re Haight, 51 App. Div. 310, 317, 318, 64 N. Y. Supp. 1029; In re Harper, 27 Misc. Rep. 471, 59 N. Y. Supp. 371. The principal, however, is not very important here. The $20,000 trust fund was directed to be paid to Mrs. Radcliffe as next of kin, and the order directed the retention of $1,200 by the trustees to cover their commissions on this trust fund, and this order was entered in a proceeding instituted by her, and she subsequently ratified and confirmed said order. No appeal has been taken therefrom, and she has accepted the fruits of the same, and cannot repudiate that portion which makes against her, and enables the trustees to obtain the compensation which they nearly lost by their own remissness. That is equally true as to income arising from the $50,000 trust fund, for a reservation is likewise provided to reimburse the trustees for the commissions which they were originally entitled to deduct from the income arising from this fund. The trustees acquire no more than what by right belonged to them, and no greater burden is imposed upon Mrs. Radcliffe than she was obliged to bear. They lost their right by what is construed to be a waiver, and she assented to the entry of an order providing for the restoration to them of what they had lost.

As to the residuary beneficiaries, the trustees have on hand of income about $2,200, and as far as that will meet their commissions they are entitled to retain it.

The decree of the surrogate's court awarded to the trustees commissions for receiving the corpus of the trust estate. In this we

find no error. Commissions are usually awarded on the settlement of the accounts of executors or trustees. Beard v. Beard, 140 N. Y. 260, 35 N. E. 488. Where the latter are managing an estate which must continue for years, it is not expected, before they can receive any compensation for their services, they must wait the termination of the trust. In this case they had performed the functions of trustees for years. They had managed the trust property with thrift and good judgment. It was well invested, and was approved on an accounting by the surrogate, and it was their right to be paid for receiving this property. The commissions to be awarded upon distributing the principal of the fund must be deferred until the moneys are paid over, but the compensation for receiving is a distinctive one, and has been earned.

Again, it is urged that the trustees are not entitled to commissions on the securities which came from the testator, and which they have not converted into cash, but have retained, as they were first-class securities. The whole scope of the trusteeship is to keep the money invested in securities of this kind in order to bear an income, and the executors might properly be condemned if they had parted with safe mortgage investments, which the testator had carefully made. As was well said in Re Curtiss, 9 App. Div. 285, 37 N. Y. Supp. 586, 41 N. Y. Supp. 1111, at page 293, 9 App. Div., and page 590, 37 N. Y. Supp.:

"It would be impolitic for the law to deny to executors commissions under such circumstances, because to do so might invite the disposal of investments judiciously made by the testator for the purpose only of entitling such executors to commissions upon the proceeds. It is the policy of the law to remove this temptation."

The executors are given the usual power to sell the real estate of the testator. They still retain unsold some of this land, and are receiving the rents and income therefrom as part of the trust estate. The decree allows them commissions upon this unsold real estate. We think they are not entitled to this allowance upon the corpus of this class of property which came to them from the testator. Phœnix v. Livingston, 101 N. Y. 451, 5 N. E. 70. If it should be turned over to the residuary legatees, commissions would then be allowable at an agreed or ascertained value, but during the management of it by the trustees they are limited to compensation upon the income.

We have not gone over the computations made in the decree allowing commissions, and, in order that there may be no misunderstanding as to our position on this branch of the case, we will recapitulate the rules which are to govern in the allowance of these commissions: (1) Each executor is entitled to the commissions provided for in section 2730, Code Civ. Proc. (2) Each trustee is entitled to one-half of the commissions allowed by said section for "receiving and paying out," and which is to be computed on the entire principal which came into his custody as trustee. (3) Each trustee is also entitled to commissions for "receiving and paying out" the income of the trust estate, subject, however, to diminution by reason of failure to deduct the same when payments were made from time to time, and which situation is discussed and provided for in the foregoing. (4) In these

computations the real estate of which testator died seised, and which now remains unsold, is not to be included.

If any departure has been made by the decree of the surrogate's court from these rules, proper corrections can be made in the order provided for. This has been a protracted, expensive, and unfortunate litigation, and barren of substantial benefit to the contestants. It has depleted their incomes by large expenses, and has engendered bitter feelings between them and the men chosen by their donor to control the property for them, and these antipathies will continue until the trusteeship is ended.

The decree of the surrogate's court is modified in so far as it authorizes the trustees to set apart a sinking fund to provide for the contingency of the "wearing away" of premium on bonds, and also denying the executors the right to retain anything out of the income on hand for the payment of commissions except as hereinbefore stated, and also by disallowing commissions on the body of the real estate of which testator died seised and which remains unsold, and as so modified said decree is affirmed, with costs and disbursements of all parties on this appeal to be paid out of the income, and chargeable equally to each of the four contesting appellants. In case of disagreement, the form of the order is to be settled before Mr. Justice SPRING upon five days' notice. So ordered. All concur.