MCBRYAN v. TROWBRIDGE.

ATTACHMENT—GROUNDS FOR—FRAUDULENT DISPOSITION OF PROP-
ERTY—INTENT TO DELAY CREDITORS.

> Under 3 Comp. Laws 1897, § 10556, making the disposition of
> one's property, with intent to defraud creditors, ground for
> attachment, the writ may be sued out where a debtor mort-
> gages property, worth twice the amount of his debts, to credi-
> tors representing only one-half the total indebtedness, with
> an avowed intention thereby to gain time to meet, with pros-
> pective profits, the claims of the unsecured creditors; the in-
> tent to postpone the collection of the claims of such credi-
> tors being the same in legal effect as an intent to defeat them.

Appeal from Wayne; Donovan, J. Submitted Novem-
ber 15, 1900. Decided January 29, 1901.

Bill by William H. McBryan, trustee of the estate of
Pulaski A. Billings, a bankrupt, against Luther H. Trow-
bridge, Walter B. Drew, and Harry F. Chipman, to set
aside an attachment levy. From a decree dismissing·the
bill, complainant appeals. Affirmed.

*Graves & Hatch*, for complainant.

*Jasper C. Gates*, for defendant Trowbridge.

MOORE, J. Complainant filed a bill of complaint to set
aside an attachment levy made upon certain real estate.
From a decree dismissing the bill of complaint, he brings
the case here by appeal.

On the 23d of April, 1898, an attachment suit was com-
menced against Pulaski A. Billings by Luther H. Trow-
bridge. The affidavit was made by Mrs. Trowbridge.
Among other things stated in the affidavit is the follow-
ing:

"And this deponent further says that she has good
reason to believe, and does believe, that the said Pulaski A.

Billings and Walter B. Drew have assigned and disposed of, and are about to assign and dispose of, their property, and the property of each of them, with intent to defraud their creditors."

The writ was put in the hands of the sheriff, Mr. Chipman, who, upon April 25, 1898, levied upon certain real estate. The defendant appeared in this case, and pleaded the general issue. Mr. Billings was adjudged a bankrupt on January 19, 1899, and the complainant was appointed trustee of his estate. This bill was filed in October, 1899. Subsequent to that date, but before this case was heard, in May, 1900, a judgment was rendered in the attachment case in favor of Mr. Trowbridge for $575.

There are many reasons assigned in the bill of complaint why the attachment levy should not stand, but the one relied upon in the court below, and here also, is that Mr. Billings had not made such a disposition of property as to justify suing out the writ. Counsel for complainant say:

"In order to sustain an attachment for the alleged fraudulent disposition of property, either actual or contemplated, by a debtor, the plaintiff in the attachment suit has the burden of proof cast upon him to prove four things, viz. :

"1. The actual or contemplated disposition by the debtor of his property.

"2. That such disposition is an unlawful one, considering the circumstances of the parties.

"3. That such disposition is prejudicial to the plaintiff.

"4. That such disposition is accompanied by a fraudulent intent on the part of the debtor."

They particularly urge in this case the second and third of these propositions, and say there is no proof in the case to sustain them. They insist that a mortgage to secure present advances is not a ground of attachment,— citing *Gore* v. *Ray*, 73 Mich. 385 (41 N. W. 329); and that a mortgage to secure past indebtedness and future advances to enable defendant to continue business is no ground for attachment,—citing *Armstrong* v. *Cook*, 95 Mich. 257 (54 N. W. 873). It is also said the disposition

of the property must be prejudicial to the plaintiff in the attachment suit,—citing *Carver* v. *Chapell*, 70 Mich. 49 (37 N. W. 879); *Lord* v. *Wirt*, 96 Mich. 415 (56 N. W. 7). It is said the plaintiff must show that he is hurt; that it is not sufficient to show that other creditors are hurt,— citing *Zeigler* v. *Cox*, 63 Ill. 48. It is also said:

"If the disposition of his property by Billings was not unlawful, his motive in making the disposition cannot render it unlawful. A wrongful intent may be presumed from an unlawful disposition of property, but an unlawful disposition of property cannot be presumed from a wrongful intent. Billings may have been ever so maliciously inclined towards Trowbridge; he may have intended that Trowbridge should fail to get his pay; but the means used by Billings to accomplish this purpose were lawful, and the intent cannot make them unlawful. This is the settled law in this State. *Jordan* v. *White*, 38 Mich. 253; *Gore* v. *Ray*, 73 Mich. 385, 391 (41 N. W. 329). The case of *Scripps* v. *Crawford*, 123 Mich. 173 (81 N. W. 1098), is decided on this principle."

If it be conceded these various propositions are correct statements of the law, it is important to inquire whether the facts in this case bring it within them. Counsel, in their brief, say:

"Mr. Billings had a stock of goods worth $29,000, and real estate worth $3,375. He owed $15,500. His assets were twice his liabilities. He wanted to get rid of a competitor. He needed accommodations at the bank. He hid none of his property. He pledged none but for *bona fide* debts. How can it be said that the use he made of the property was in any sense unlawful?"

Do the facts warrant these statements? Mr. Billings' testimony shows that prior to February 12, 1898, he was indebted to the amount of fifteen or sixteen thousand dollars, about half of which he owed to the Citizens' Savings Bank, while the rest of it was divided among 109 other creditors. February 12, 1898, the Billings & Drew Company was organized, with 3,500 shares of stock at $10 a share. Mr. Billings had 2,899 shares, Mr. Drew 600 shares, and Thomas Drew one share. The assets of this

corporation consisted of the stocks of goods formerly owned by Mr. Billings and Mr. Drew, respectively.   On February 24, 1898, Mr. and Mrs. Billings executed a mortgage to the Citizens' Savings Bank upon all the real estate Mr. Billings owned, except some lots which were valued at $875, and which are the lots upon which the attachment levy was made.   The consideration stated in the mortgage was $1,000.    Mr. Billings testified the property described therein was worth $2,500.    The mortgage contained the following clause:

"This mortgage and its accompanying note are given to secure the payment of all notes made by the Billings & Drew Company to said mortgagee, and also to secure the payment of any and all notes upon which the name of Pulaski A. Billings shall appear either as maker or indorser, which are now or hereafter shall be owned by said mortgagee; and this mortgage, until discharged, shall be a continuing security for the payment of said notes, or any renewals thereof, in whole or in part."

The mortgage was acknowledged the 23d of March.

At the time the mortgage was turned over to the bank, Mr. Billings transferred to them $24,000 of his stock.   He transferred to Mr. Radford, who for some time had been acting as his attorney, to help compensate him, 291 shares of stock.   The stock book shows the stock was transferred to Mr. Radford the 23d day of April.   He also transferred to his wife $2,000 worth of stock, which he says was for a debt due her, represented by a note dated November 11, 1897.   He retained eight shares of stock for himself. After this transaction was completed, he had remaining, according to his testimony, real estate worth $875, bills receivable worth $400, and eight shares of stock, of the par value of $80, in the Billings & Drew Company, while he owed about $8,000 to upwards of 100 creditors, none of whom were secured.

Upon the examination of Mr. Billings the following questions and answers occurred:

"*Q.* Now, I want you to look over this schedule of your creditors, and say if you can point me out a single debt which you did not owe at the time you went into this arrangement that we have been talking about here.

"*A.* I say we owed every one of them on the 24th of February, 1898. I owed every one of these debts at the time I made the arrangement with the bank. I owed approximately $15,000 to 109 creditors, besides the bank. I owed the bank in the neighborhood of $8,000 or $9,000.

"*Q.* But after you had made this arrangement, the amount you had left in your hands to pay them with was $875 worth of real estate, and bills receivable worth $400, and eight shares of the stock of the Billings & Drew Company. Now, sir, I want you to tell me how you expected that this property was going to pay your $8,000 of indebtedness.

"*A.* I expected to have made money enough in the new business, when we started out, to pay all my debts, with the making of the arrangement with my creditors,—to pay them in full. By that I mean to pay them as fast as I could. That is what I expected doing when the corporation was formed.

"*Q.* Is it not a fact, in other words, that you were perfectly aware that, if your $8,000 worth of unsecured creditors, 109 unsecured creditors, came to you and insisted on having their debts due paid, you had not more than enough to pay them 10 or 12 cents on the dollar,—is not that the fact?

"*A.* Yes, sir; I guess that is about the fact.

"*Q.* In other words, you knew very well when you made this mortgage, and pledged your $24,000 worth par value of the stock in the Billings & Drew Company, that these 109 unsecured creditors could not get their pay unless you made it out of your business?

"*A.* I don't see how they could.

"*Q.* And you knew that perfectly well at the time you made that arrangement?

"*A.* Yes, sir. * * *

"*Q.* Now, is it not a fact that you hoped and expected in this time the Billings & Drew Company to make money and prosper, and that you would pay off your creditors, and have something left for yourself?

"*A.* Sure, that was my intention; most decidedly.

"*Q.* And that was the reason you fixed your property up in the shape you did, because that was the intention; is that right?

"*A.* Yes, I put a mortgage on that property for future accommodations from the bank.  (Question repeated.)

"*A.* I have said that I put the mortgage on there for future accommodations,—to make money, to do some business, pay my debts, and get started again.  By getting started again I mean in business as Billings & Drew Company.

"*Q.* What do you mean by getting started again?

"*A.* Why, doing business as the Billings & Drew Company.

"*The Court:* You had in view, when you put that mortgage on, you intended to pay everybody, but you intended to get a chance to turn yourself?

"*A.* Yes, sir.

"*Q.* Is that the idea?

"*A.* Yes, sir.

"*Q.* You put it on so that in the meantime, while you were starting up, things would wait in abeyance?

"*A.* Yes, sir.

"*Q.* I understood it that way,—so that it would give him room to turn himself.  It would stay the immediate crowd, and give you a chance to pay everybody alike, more particularly?

"*A.* Yes, sir.

"*Q.* That was the way I got it.

"*A.* That was my intention.  That is what I said.  I have tried to make myself clear.

"*Q.* Your idea was that all these people,—these 109 people, or some considerable number of them,—if they came down with attachment, or crowded you, you could not pay them.  You knew that perfectly well?

"*A.* Yes, of course, I could not.  *  *  *

"*The Court:* What you really wanted was time to turn yourself?

"*A.* Yes, sir.

"*Q.* That is, to stand still a moment, to wait your rush on me until I can move?

"*A.* Yes, sir."

Mr. and Mrs. Trowbridge testified they had been trying to collect the debt due Mr. Trowbridge, and that early in March Mr. Billings came to their office, and, after considerable other conversation, said:

"'Now, let us talk this matter over, and effect some sort of a compromise.  I acknowledge the indebtedness;

I am willing to acknowledge judgment now.' I said: 'We cannot talk about any compromise. All we want, and all we ask, first and last, is payment of what is due; and, if you are prepared to do that, there is no use in wasting your time or ours. 'There is no occasion for any talk of compromise.' 'Well,' he said, 'I acknowledge the indebtedness; I am ready to confess judgment; but I cannot pay you today, I cannot pay you this week, I cannot pay you the week after, and I don't know when I can pay you.' I said that, 'If that is a fact, there is one course left to us, and we must proceed to collect;' and then in a decidedly firm tone of voice he said: 'You can try to collect; you can sue; but I have put my business into a stock company, and you cannot touch that; and I have put my real estate and other property up at the bank as collateral, and you cannot touch that. Creditors cannot touch any of my property. You can sue, but you cannot collect anything;' and in a triumphant manner he turned around and left the office."

It will be observed the transfer of stock to Mr. Radford was made the same day the attachment suit was begun. What, then, is the situation? Mr. Billings owed $15,000 or $16,000. He had $29,000 worth of goods, which he turned over to the Billings & Drew Company, for which he received stock of a corresponding amount. He gave a mortgage to one of his creditors, who has a claim of $7,000 or $8,000, and is to make advances of $1,000 more, upon $2,500 worth of real estate, and transfers to it $24,000 of stock. To two other creditors he makes other transfers of property, so that property counsel say is worth twice the amount of all his debts is nearly all transferred to three of his creditors, while he retains in his control less than $1,400 worth of property, and has upwards of 100 creditors, with $7,000 or $8,000 of debts, all unsecured. He states that one of the purposes in making these transfers was to put his property in such condition that the unsecured creditors could not at once compel payment, and so he should have a chance to turn himself, and earn money to pay off his indebtedness.

3 Comp. Laws 1897, § 10556, states what must be contained in the affidavit to secure the writ. Applying the

provisions of that section to this case, it was necessary to show Mr. Billings had assigned, disposed of, or concealed, or was about to assign, dispose of, or conceal, any of his property with intent to defraud his creditors. What must a debtor do in making a conveyance of his property that his action may be deemed in law to defraud his creditors? In 14 Am. & Eng. Enc. Law (2d Ed.), 244, 245, the rule is stated as follows:

"*Intent to Hinder or Delay Creditors.* But, in order to render a deed fraudulent, it is not necessary that the debtor should intend entirely to defeat the creditor in the collection of his claim. Creditors are entitled not only to be paid, but to be paid as their claims accrue, and a debtor has no more right to postpone payment simply for his own advantage than to defeat it altogether. A purpose to hinder and delay a creditor is, therefore, fraudulent, although the debtor may honestly intend that all his debts shall ultimately be paid."

See *Herman* v. *McKinney*, (C. C.) 47 Fed. 758; *Corbitt* v. *Cutcheon*, 79 Mich. 41 (44 N. W. 163); *Cutcheon* v. *Buchanan*, 88 Mich. 594 (50 N. W. 756); *Pettibone* v. *Byrne*, 97 Mich. 85, 92, 93 (56 N. W. 236); *Walker* v. *Cady*, 106 Mich. 21, 25, 26 (63 N. W. 1005).

Taking the testimony in this case in its entirety, the conclusion is irresistible that the purpose of Mr. Billings in making these transfers was not simply to secure *bona fide* indebtedness and secure advances to be used in his business, but he also purposed to put his property in such shape it could not be reached by his other creditors until he was ready to place it at their disposal. We think this brought his case within the statute.

The decree is affirmed, with costs.

The other Justices concurred.