**COOK, Superintendent of Banks, v. BALL et al.**

Nos. 8432, 8433.

Circuit Court of Appeals, Seventh Circuit.

July 7, 1944.

As Modified on Denial of Rehearing
Aug. 9, 1944.

Writ of Certiorari Denied Oct. 23, 1944.

See 65 S.Ct. 93.

Wm. H. Thompson and Perry E. O'Neal, both of Indianapolis, Ind., Patrick I. Mulligan and Roger P. Brennan, both of Cleveland, Ohio, and Everett Warner, of Muncie, Ind., for appellants.

John B. Putnam and Edwin A. Howe, both of Cleveland, Ohio, Hubert Hickam and Alan W. Boyd, both of Indianapolis, Ind., and Thomas J. Herbert, Atty. Gen., of Ohio, for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiff, a citizen of Ohio, as Superintendent of Banks of the State of Ohio in charge of the liquidation of The Union Trust Company, Cleveland, Ohio, and as trustee for certain creditors of O. P. & M. J. Van Sweringen, a co-partnership, brought this action against defendants, citizens of Indiana, to recover the value of 8250 shares of the common stock of Midamerica Corporation, claimed to have been converted by the defendants.

These cases were tried by the court without a jury. The court made special findings of fact, rendered its conclusions of law thereon, and entered judgments against the defendants. To reverse the judgments, defendants appeal.

The decision turns principally on the question whether the Van Sweringen partnership owned the 8250 shares of common stock of Midamerica Corporation. There is no controversy about whether defendants' treatment of the stock constituted a conversion, if the partnership owned the stock and were entitled to possession of it. There is but little, if any, dispute as to the facts.

About 1906, O. P. and M. J. Van Sweringen, brothers, began the acquisition and management of a number of railroads and real estate enterprises, which they controlled principally by and through The Vaness Company and one of its subsidiaries, The Cleveland Terminals Building

Company (hereinafter referred to as Vaness and CTB), financed largely through bank loans, bonds, or preferred stocks. In 1912, they formed a partnership known as O. P. & M. J. Van Sweringen, which continued until dissolved by the death of M. J. Van Sweringen on December 12, 1935. O. P. Van Sweringen died on November 23, 1936. The estate of M. J. Van Sweringen had debts of more than $49,000,000 and assets of less than $100,000. The estate of O. P. Van Sweringen had debts of over $50,000,000 and assets of less than $550,000. In December, 1936, a receiver was appointed for the partnership estate and claims were allowed against the estate in an amount exceeding $20,000,000. The assets of the partnership were appraised at $355,502.

At all relevant times the Van Sweringens dominated Vaness and CTB. Until December 28, 1931, the partnership owned 130,000 of the 160,000 shares of Vaness common stock. On that day the partnership assigned 16,250 of these shares to B. L. Jenks and 113,750 shares to Vaness Company, a Maryland corporation (hereinafter called Vaness of Maryland), for which it issued all of its stock, 5688 shares to O. P. Van Sweringen and 5687 to M. J. Van Sweringen. The 11,375 shares were recorded on the partnership books as an asset of the partnership. In 1935, the holding and controlled companies had assets of a book value in excess of $2,500,000,000 and came to be known as the "Van Sweringen Empire" or "Van Sweringen System." The development and management of these properties was the principal occupation and interest of the Van Sweringens, who were never married and who, throughout their adult lives, lived and worked together, their home and furnishings being in the partnership name and practically all their activities being conducted by and through the partnership.

Prior to October, 1930, Vaness and CTB had borrowed $16,000,000 and $23,500,000 respectively upon notes given to two syndicates of banks headed by J. P. Morgan & Co. (hereinafter called "Morgan"). In order to obtain these loans, it was necessary for Vaness to free itself from indebtedness to certain Cleveland banks and to obtain the release of certain valuable securities. This was accomplished by loans made by the Cleveland banks to the partnership upon the stock of Vaness and a contribution by the partnership to the capital of Vaness of $14,000,000, borrowed from the Cleveland banks. This indebtedness of the partnership remained unpaid at the death of the Van Sweringens. As collateral for these notes each company pledged certain corporate securities, among which were about 2,000,000 shares of common stock of Allegheny Corporation, the holding company through which the railroads in the system were controlled. As the maturity date of the notes (May 1, 1935) approached, it was evident the notes could not be paid. At this time the partnership as well as the Van Sweringens was insolvent.

From the fall of 1934, the Van Sweringens negotiated with Morgan and their Cleveland creditors with a view of effecting a plan for extending the time of payment or of refunding the obligations of Vaness, CTB, and the partnership. The plans provided for the organization of a corporation to acquire the collateral pledged and the issuance of various classes of securities to preserve the relative rights of the creditors, the Van Sweringens to own the common stock of the corporation with complete or at least a degree of voting control.

After being advised on May 1, 1935, that the collateral held by Morgan would be sold, and until July, 1935, the Van Sweringens continued to negotiate with their Cleveland creditors. They also negotiated with Morgan for the purchase of the notes and collateral at private sale, offering therefor $2,275,000. July 26, 1935, Morgan advised that the price offered was insufficient and that the collateral would be sold at public auction.

During this period the Van Sweringens contacted Ball. There had been no previous business relationship between them except that Ball had been a director of one of the railroad companies in which they were interested. August 11, 1935, the Van Sweringens, accompanied by G. A. Tomlinson, came to Muncie, Indiana, and told Ball they needed help, informed him of Morgan's intention to sell the collateral, and advised Ball that they believed that if $2,000,000 in new capital were raised they could borrow the funds necessary to purchase the collateral by pledging it as security therefor. At this time Ball knew that the partnership and the Van Sweringens were insolvent. Negotiations between

the Van Sweringens, Ball, and Tomlinson continued for more than a month. Between August 11 and August 17, 1935, Ball made trips to Cleveland and conferred with O. P. Van Sweringen. For the purposes of sale, through the efforts of the Van Sweringens, Morgan agreed to divide the collateral into Groups. Groups 1 and 3 included, among other securities, common and preferred stock of the Allegheny Corporation, through which corporation the control and management of the railroads were held and exercised by O. P. & M. J. Van Sweringen. The possibility of organizing a corporation to bid for the collateral in Groups 1 and 3 was discussed, as well as the amount of money to be provided by Ball and Tomlinson; the number of shares of common stock to be received by the Van Sweringens and by Ball and Tomlinson; and the terms of a proposed agreement, resulting in the execution of a contract, dated September 21, 1935, but actually signed on September 30, 1935. The contract:

"Cleveland, Ohio, September 21, 1935.

"Messrs. O. P. and M. J. Van Sweringen
"Cleveland, Ohio

"Dear Sirs:

"You have called to our attention an investment possibility in the proposed sale in New York of certain securities pledged to secure collateral notes of The Vaness Company and The Cleveland Terminals Building Company. The more important of these securities are those of companies created and developed under your control, direction or management. These companies, in the main, prospered up to the time of the depression. We believe that under the same control, direction and management, they will again prosper if the present improvement in business conditions shall continue, as we believe it will. If we did not so believe, we should not be interested in acquiring these securities, in whole or in part, under any circumstances. As it is, we should be interested if, but only if, we could be assured that you will participate actively in their direction and management. Our discussions of the basis upon which this may be assured have now reached a period where it seems desirable for the understanding between us to be clearly set forth. We therefore propose:

"(1) That a corporation be created with broad charter powers, as near as may be enabling it to do anything that individuals can do, this corporation to have an authorized capital structure of—

"(a) 250,000 shares of first Preferred Stock of no par value, each share preferred over Common Stock as to cumulative dividends at the rate of $5.00 per share per annum and as to $100.00 in the event of liquidation, callable at par at any time, with the right to vote only in the event of merger, consolidation or sale of the assets of the corporation and with no pre-emptive rights;

"(b) 150,000 shares of Common Stock of no par value, with full voting and pre-emptive rights.

"(2) We will subscribe to an aggregate of 20,000 shares of first Preferred Stock at an aggregate price of $2,000,000.00, such commitment to be several and not joint, each of us subscribing to such portion thereof as we have indicated hereon after our signature, to be paid for upon call of the Board of Directors. We will likewise subscribe for 15,000 shares of the Common Stock of the new corporation and pay therefor forthwith $1.00 per share, or an aggregate of $15,000.00.

"(3) In furtherance of our desire for your active participation in the management and direction of the new corporation, we also desire that you become interested in the ownership of such corporation and to this end we will, upon the issuance of these shares and upon the corporation having purchased at such sale either the securities described under Group 1 or Group 3 in the notice of said sale, deposit 8,250 shares of the Common Stock in escrow under an option agreement granting to you, and to the survivor of you, exclusively and without the right of assignment by you, the right to purchase such shares at our cost plus 5% interest per annum at any time after you shall have satisfied at least five of the six Directors of such corporation that you (in keeping with your expressed desires) have paid or adjusted any and all claims based upon now existing commitments or relationships that may now be or hereafter become enforceable against you. The said option is to run for a period of ten (10) years and be irrevocable, and during the life of such option you will have the sole and exclusive right to vote and represent such deposited Common Shares.

\* \* \* \* \* \*

"If the above meets with your approval, will you kindly confirm the same by signing this letter or a duplicate original hereof in the space below provided, whereupon

the above will constitute the contract between us.

"Yours very truly,

| | Amount of Subscription | |
| | Preferred Shares | Common Shares |
| --- | --- | --- |
| George A. Ball (Signed) | 13333 | 10000 |
| G. A. Tomlinson (Signed) | 6667 | 5000 |

Accepted Sept. 30th, 1935:
O. P. & M. J. Van Sweringen
 By O. P. Van Sweringen"

After the first contact between the Van Sweringens and Ball and the reaching of the agreement as to the division of the common stock of the corporation proposed to be organized, the Van Sweringens carried on the negotiations, completed the arrangements, and furnished the services which were necessary to and did enable the corporation to be organized to acquire the Group 1 and 3 collateral. Neither Ball nor Tomlinson participated in these negotiations and all of the expenses entailed, with the exception of six telephone calls charged to Midamerica, were paid by the Van Sweringens.

On August 22, 1935, Morgan was authorized to proceed with the sale of the pledged collateral at public auction. September 28, 1935, Midamerica was organized under the laws of the State of Ohio by Van Sweringens' attorneys. September 30, the contract of September 21, which had been prepared by Van Sweringens' attorneys, was signed in New York by Ball and Tomlinson, and accepted by O. P. Van Sweringen on behalf of O. P. & M. J. Van Sweringen. Within a few days Ball paid $1,343,300 in cash for 13,333 shares of the preferred stock and 10,000 shares of the common stock of Midamerica, and Tomlinson paid $271,700 in cash and gave his note for $400,000, which he paid October 16, 1935, for 6,667 shares of the preferred stock and 5,000 shares of the common stock of Midamerica. The one dollar per share or $15,000 paid for the common stock was purely nominal.

September 30, the first meeting of the directors of Midamerica was held in New York, and the Van Sweringens and their close business associates were elected to all of the offices, to hold office until their respective successors should be chosen. At this meeting resolutions were adopted authorizing Midamerica to bid at the auction sale and to purchase any part of the securities included within Groups 1 and 3, at such price or prices as O. P. Van Swearin-

gen might determine. Midamerica, financed through the use of funds borrowed by Midamerica from a trust company and those furnished by Ball and Tomlinson, on September 30, 1935, bought that part of the collateral necessary for the control of the railroads for $3,121,000.

O. P. Van Sweringen became president, M. J. Van Sweringen vice-president, and the Van Sweringens, Ball, Tomlinson, Bradley, and Bernard became directors of Midamerica. Through the right of the Van Sweringens to vote 55% of the common stock they continued to manage the various companies whose securities Midamerica had purchased. No certificates of stock of Midamerica were issued and no request for their issuance was made by Ball until after the death of O. P. Van Sweringen, nor were any shares deposited in escrow.

Tomlinson was a director in the Midland Bank. Midland was a participant in the Morgan syndicate which had made the loan to Vaness. Prior to the sale, on September 21, 1935, Tomlinson had offered Midland the opportunity to invest in Midamerica whatever sum it received from Morgan on the same basis as he was investing his money. On October 5, 1935, Midland paid Tomlinson $101,354.50, the amount of its proportionate share of the proceeds received from the sale of the pledged collateral, for which Tomlinson, in fulfillment of his offer made prior to the auction, gave to Midland a receipt for 754½ shares of the common and 1,006 shares of the preferred stock of Midamerica, which stocks Midland, on April 29, 1937, sold to defendant Foundation for $625,000.

In December, 1935, Ball agreed to buy all of Tomlinson's stock in Midamerica and before April 1, 1937, completed the purchase of all the preferred and part of the common, so that on that date he held 14,-050 shares of Midamerica common.

On April 1, 1937, the receiver of the partnership formally notified Ball that the Van Sweringen partnership owned or had an option to buy 8250 shares of Midamerica common stock, and that he, as receiver, demanded recognition and protection of his rights.

On March 22, 1937, Ball and members of his family incorporated, under the laws of Indiana, the George and Frances Ball Foundation. On April 1, 1937, Ball transferred to Foundation, without considera-

tion and with knowledge of the claims of the receiver, all of the common stock of Midamerica then in his possession.

The court made findings of fact and conclusions of law. Essentially contained in all of the court's findings are these facts:

1. That the contract was an arrangement assuring to the Van Sweringens that Ball would put up $2,000,000 to help them acquire, through the medium of a new corporation, the securities pledged to Morgan which were necessary to their continued control of the "Van Sweringen Empire."

2. That by the arrangement the parties agreed to enter into a joint venture: Ball and Tomlinson to furnish the necessary funds and receive therefor preferred stock of a par value equal to the funds furnished with five per cent interest thereon, and forty-five per cent of the profits represented by 45% of the common stock of the new corporation; the partnership to make the necessary arrangement and handle the transaction and keep fifty-five per cent of any profit through its ownership of 55% of the common stock.

3. That the proposed division was satisfactory to the parties, but all recognized that, on account of the debt situation of the Van Sweringens, the outright receipt of their interest might result in its being seized by creditors. The Van Sweringens did not desire this result, and Ball and Tomlinson were willing to join with them in a method by which it was considered that such a result could be avoided.

4. The method in question was devised by the Van Sweringens and prepared by their counsel. It consisted of providing for the putting of their interest in the form of an option, on the face of which they could obtain their interest by the payment of a nominal amount after they had paid or adjusted their debts.

5. Notwithstanding the apparent contingent form of their interest, the partnership received immediately substantially all the incidents of ownership of the stock, including control of the new corporation.

6. The partnership performed its part of the agreement, its performance constituting the real consideration for their 8250 shares of stock, and thereby their interest in the stock was available to their creditors.

7. That the condition precedent to the acquisition of the stock by the Van Sweringens was designed to, and did hinder, delay, and therefore defraud the partnership creditors.

When the court entered these findings, there were pending actions by Vaness and CTB against Ball and Foundation asserting that the activities of the Van Sweringens in the Morgan sale constituted a violation of their fiduciary duties to Vaness; that the collateral that had belonged to Vaness should be declared to have been acquired by Midamerica as a constructive trustee for Vaness; and that Ball and Foundation should account to Vaness for the proceeds and profits. Because of the pendency of these actions, the court deferred determination of the amount of the damages. Instead, the court referred the matter of determining the value of 8250 shares to a special master, such determination to be made upon final disposition of the Vaness and CTB suits. Those suits were settled through payments by Foundation totaling $662,500, and thereafter the case was heard by the special master. The master found the value of the 8250 shares as of April 1, 1937, and that the Van Sweringens, by their activities in connection with the Morgan sale, had been guilty of fraud and a breach of fiduciary duty, the effect of which was to reduce the value of the 8250 shares by the amount of the settlement of the Vaness and CTB claims. The court, after eliminating the finding that there had been fraud in connection with Van Sweringens' activities, substantially adopted the master's findings.

The court made additional findings and conclusions of law to the effect that the 8250 shares were the absolute property of the partnership from the time Midamerica was organized and were held in trust for it, and that by transferring 14,050 shares to Foundation on April 1, 1937, Ball was guilty of converting 8250 of the shares; that the shares had a value of $2,678,820.25 on April 1, 1937; that Ball was entitled to a credit of $8250 paid by him for the 8250 shares with interest from September 30, 1935; that Ball, having no interest in Vaness and CTB, could not assert as a defense, Van Sweringens' breach of fiduciary duty to those companies; that the effect of the breach was to reduce the value of the 8250 shares by 55% of the amount paid by Foundation in settlement

of the suits; that plaintiff was not estopped to maintain the present action by reason of the participation of the four Cleveland banks in the sale of 754½ shares of Midamerica by Midland to Foundation; and entered judgment for $3,664,616 in both cases. In these appeals the correctness of the amount of the judgments is not questioned.

On March 31, 1943, after the suit against Ball had been submitted on the objections to the master's report, plaintiff instituted suit against Foundation. By consent, the record in the Ball case was made a part of the record in the Foundation suit. Additional evidence was introduced by Foundation and this was made a part of the record in the Ball case, upon which the court entered findings and conclusions substantially like those in the Ball case, and entered judgment for plaintiff, satisfaction of the judgment in either case to be deemed a satisfaction to such extent of the judgment in the other case.

At the outset we are met with defendants' contention that the contract of September 21 was made with the Van Sweringens as individuals and not with the partnership.

Defendants admit that the Van Sweringens transacted business through their partnership, but they argue that the Van Sweringens conducted the major portion of their business through corporations; that two of their most important undertakings were as individuals; and that they controlled the companies in the "Empire" through their right to vote the stock of the companies. In this way they became the dominant directors and as directors they were acting individually, and not as a partnership.

It will be enough to say that the question involved in this contention is very largely a question of fact to which the trial judge gave not superficial, but careful consideration. In determining the capacity in which the Van Sweringens entered into the contract, he considered all the evidence. He considered not only the fact that the contract was signed by O. P. Van Sweringen for "O. P. & M. J. Van Sweringen," the manner in which partnership contracts are ordinarily signed, but the fact that the two Van Sweringens did form a partnership in 1912; that such partnership had existed continuously since its formation; that practically all of their business had been transacted by the partnership unless otherwise specially stated; that the individual signatures of the Van Sweringens were not attached to the contract and that no statement as to the number of shares to be issued or owned by each was found in the contract; and that no authority for O. P. Van Sweringen to bind M. J. Van Sweringen was shown. These are not all but are some of the facts that tend to support the ultimate conclusion that the name "O. P. & M. J. Van Sweringen" did refer to the partnership. Consequently, the finding that the contract was made with the Van Sweringen partnership is binding upon us, unless we can say the finding was clearly wrong. Rules of Civil Procedure, Rule 52, 28 U.S.C.A. following section 723c. This we cannot say, since a careful consideration of the record convinces us that the finding is supported by the evidence.

We now consider the all important question in the case: Did the Van Sweringens own the 8250 shares?

Defendants contend that the Van Sweringens never had more than a personal non-assignable option to buy the stock at any time after they had satisfied five of the six directors of Midamerica that they had paid or adjusted their debts, a condition which they never met. They assert that the contract was unconditional in its terms; that the option provisions were valid; that the contract was not in fraud of creditors; and that the condition that the Van Sweringens pay or adjust their debts was not impossible of performance.

The argument is that the Van Sweringen partnership had no interest in the pledged collateral; that it never had any property to transfer, or sell, or to place in the name of someone else; consequently, the contract was not in fraud of creditors; and that the four Cleveland banks knew the terms of the contract.

The further argument is that Ball had no desire to become an active manager of the corporation, the securities of which he was thinking of buying; that he was willing to invest his money, but did not want personally to take on management duties and responsibilities; that he desired to make certain that the Van Sweringens would continue in the management after the purchase and have an incentive to give their best efforts to the enterprise; that Ball had the right to give them an option which could only be exercised upon such

conditions as he should determine; that the Van Sweringens furnished no consideration for any interest in the stock; that Ball was under no obligation to grant to the Van Sweringens any kind of interest in the stock; and that the findings are clearly erroneous.

In their reply brief defendants make the further argument that because a creditor has no right to direct a debtor in the disposition of his services, the debtor may give away his services as a gratuity without violating the rights of his creditors. Most Worshipful Grand Lodge v. Allen, 208 Ala. 292, 94 So. 343, 28 A.L.R. 1043.

 To render a contract illegal it is not necessary that a debtor should intend to defraud his creditors in the collection of their claims; it is illegal if made with intent to hinder and delay creditors. Shapiro v. Wilgus, 287 U.S. 348, 354, 53 S. Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128. Creditors are entitled not only to be paid, but to be paid as their claims accrue, and a debtor has no more right to postpone payment simply for his own advantage than to defeat it altogether. A purpose to hinder and delay a creditor is, therefore, fraudulent, although the debtor may honestly intend that all his debts shall ultimately be paid, McBryan v. Trowbridge, 125 Mich. 542, 84 N.W. 1084, 1086.

 The character of an instrument depends upon its effect, since courts look to the real nature of an agreement, and not at all upon what the parties call it, Corbett v. Riddle, 4 Cir., 209 F. 811; Burroughs Adding Mach. Co. v. Bogdon, 8 Cir., 9 F.2d 54, and an agreement in form a mere option may be held, by reason of the interest in the subject matter of the one holding the apparent option right, to create a present subsisting interest in the property. Hoover v. Bouffleur, 74 Wash. 382, 133 P. 602; Keeline v. Clark, 132 Iowa 360, 106 N.W. 257. Because the rights of parties in equity are determined from the substance of a transaction rather than the form and since equity looks to the intent of the parties, not only the terms of an instrument, but the surrounding circumstances and the situation of the parties will be examined. "Conduct and purpose have a quality imprinted on them by the law," Shapiro v. Wilgus, 287 U.S. 348, 357, 53 S.Ct. 142, 145, 77 L.Ed. 355, 85 A.L.R. 128. Consequently, in the consideration of defendants' contentions, we must determine

from all the evidence, what was Ball's and the Van Sweringens' conduct prior to September 30, 1935, and subsequently, what did it show to be their conceptions of their obligations, so that we may find the scope of the contract and what was in fact intended by the parties.

In considering the contentions here made, the views of the trial judge are interesting and helpful. Among other things he said:

"Under the contract there were two conditions which the partnership must meet before it was entitled to the * * * stock. First, it must, within ten (10) years, pay to the defendant * * * $8250, * * *. All interested parties knew that this condition could be met immediately or at any time. When we consider the ability of the Van Sweringens to raise money, the sum may be said to be nominal. * * * Second, it * * * must satisfy five of the six directors of Midamerica Corporation that it had paid or adjusted any and all claims against it. * * * The partnership, at that time, had commitments in excess of $20,000,000. All parties * * * knew that this condition could never be met. The defendant knew * * * that it was almost equally inconceivable that they could compromise or settle it. He knew further that they had attempted to settle or adjust their debts prior to the auction sale, but were unsuccessful, yet, in the face of this knowledge, one of the conditions placed in the contract required the partnership to do an inconceivable, an obviously impossible, thing, * * *. What, then, was the purpose of placing this provision in the contract—a provision which every one knew could not be complied with? * * *

"The Van Sweringens were no novices— they were men of broad experience, and they, as well as the defendant, knew and understood the impossibility of ever being able to comply with the second condition of the contract. * * * They were not young men, but were far past the meridian of life and knew that ten (10) years in the future might mean the remainder of their lives. * * * It was, therefore, of importance to them that they, in some manner, procure the voting right and control of a majority of the stock of Midamerica Corporation during what would appear to be the remainder of their lives without subjecting such stock to attachment or other legal process by their creditors. * * *

"It is clear that it was the intention of the parties to the contract to prevent the creditors from acquiring any interest in the 8250 shares of stock by judgment against the partnership * * * or other legal process. This is not only clear because of the lack of a possibility of performance of the second condition, * * *, but it is equally clear, from the testimony of the defendant, both on the trial of this case and before the Wheeler Committee. [A Committee of the United States Senate.] He did not want the creditors * * * to become owners of this stock * * *. * * * In other words, the second condition was an attempt, upon the part of the defendant * * * to prevent the creditors * * * from acquiring the ownership of a part of the stock * * * either during the life-time of the Van Sweringens or *after their death.* * * *

"The second condition of the contract did, undoubtedly, hinder and delay the creditors of the partnership, * * *. Had the 8250 shares of stock been issued to the partnership, they would then have been subject to legal process by its creditors. * * * It would seem that, in the preparation and execution of the contract, a studied effort was made to prevent this contingency, and that the language comprising the second condition is the result of that effort. * * *

"* * * It is the contention of the defendant that they [Van Sweringens] furnished no considerations which were the moving, effecting force in bringing to and securing for the Midamerica Corporation a bargain purchase of Groups 1 and 3 of the securities * * *, but that the sale was widely advertised, and that no one received an advantage at such sale over another.

"The mere fact that the publicity was given to the sale of the securities * * * and that such sale was public, does not, necessarily, mean that the price paid was the full value * * * to the purchaser. Neither does it mean that the Van Sweringens contributed nothing of value * * * in the purchase of such securities. The character of the securities, the fact that the common stock of Allegheny Corporation * * * was sufficient to guarantee the continued management and control of the vast railroad empire as a going concern, and the further fact that such management and control were to continue in the Van Sweringens—experienced and successful railroad executives—may well be considered in determining the value of such groups of securities to the Midamerica Corporation. * * * Upon an experienced business man these items of value would immediately impress themselves. There is no doubt that the defendant was so impressed * * *. This is apparent, when consideration is given to the promptness with which he reacted to the proposition and enthusiastically continued the negotiations following the first meeting. * * * The Van Sweringens continued their contacts and negotiations during this same period * * *. They gave valuable assistance in the grouping of the securities for sale in such a manner as to add to Groups 1 and 3 a maximum of value insofar as they, or anyone with whom they might be associated, were concerned. * * * these groups of securities did have a value * * * which could be measured only by taking into consideration the railroad and other valuable properties which would be controlled by the Van Sweringens through the corporation that would purchase such securities. It is reasonable to conclude that the defendant knew of these values, and that he was interested only if the Van Sweringens would continue in the management and control of such properties. * * * That the position, relationship and activities of the Van Sweringens leading up to the auction sale furnished a valuable consideration which was the moving, effective force in bringing to and securing * * * the purchase * * * of the securities sold * * * there can be no doubt, and that it was the intention of all concerned that they should have an interest in the corporation to recompense them for the services theretofore rendered—such interest to be represented by 8250 shares of the common stock. The defendant and Tomlinson contributed cash for their interest in the common stock, and the partnership contributed its position, its' relationship, and its activities before the auction sale for its interest therein. This was a valuable contribution and was so considered by all—more valuable than the contributions of the defendant and Tomlinson. * * *

"* * * the parties recognized the value of the services of the Van Sweringens and that they were to be recompensed for these services by being given an interest in the new corporation. That interest was such as to give them the continued control and management of the empire.

The contract evidences the extent of that interest to be fifty-five per cent (55%), or 8250 shares of the common stock of the Midamerica Corporation. * * * This conclusion has support also in the testimony of the defendant, himself, wherein he says, 'I did not figure that I was buying control of it.' The contract, however, attempts to make this interest contingent upon the doing of an admittedly inconceivable, an obviously impossible thing by the partnership."

In our opinion the disposition of this case does not depend upon whether the Van Sweringens had a right to give their services to Ball or Midamerica, and it may be decided without reference to what was said in the Grand Lodge case, supra. We doubt the applicability of that case, but are certain it is not controlling here.

The argument that the partnership had no ownership interest in the pledged collateral, begs the question. Plaintiff's claim is not predicated on any property interest of the Van Sweringen partnership in the collateral sold by Morgan. The real question is whether the partnership was contracting to render their services and relationships in connection with an enterprise, a joint venture, having as its object the acquisition of the collateral, and whether by rendering those services the Van Sweringens acquired property to which their creditors were entitled. Here, according to the findings of the trial judge, sustained by the evidence, which we must accept, the parties entered into a joint venture, the profits of which were to be divided, as already noted, the Van Sweringens' share, because of their debt situation, to be placed in the form of an option. Under such circumstances we think the Van Sweringens acquired property which was available to their creditors.

Defendants in elaborating their argument that the Cleveland banks knew the terms of the contract, state that the Midland and Cleveland Trust knew its exact terms, and that the representatives of Union and Guardian knew the substance of its terms before it was executed. No claim, however, is made that Ball in entering into the contract relied on any supposed acquiescence of the banks, or that he was misled in any way as to their position.

The record discloses that on September 27, Tomlinson sent to Midland a draft of the proposed contract, and that on August 15, O. P. Van Sweringen told O. L. Cox, liquidator of Union and who was keeping Guardian informed concerning the Van Sweringen debt situation, that his [Van Sweringen's] negotiations had encouraged him as to the availability of $2,000,000 of new money, which would be represented by preferred stock dollar for dollar, with 40% of the common stock as a bonus, and the remaining 60% would go to the Van Sweringens or become available to them on the coordination of their remaining debts. September 18, Van Sweringen told Cox "his backers" were still in line; that they would receive 45% of the common stock as a bonus and that his own, or 55%, would probably either be trusteed for the benefit of the Van Sweringen creditors or left in some way with his backers. October 11, Van Sweringen told Cox that the actual possession of the shares would be subject to a readjustment with their Cleveland creditors. Cox also testified that he did not press his request to see the contract, except at first, when it wasn't ready for some reason, and then M. J. Van Sweringen died or there was some sort of hiatus, so the matter was not pressed as it otherwise would have been.

Thus Cox did not get the contract until April, 1936. Certainly, the earlier statements made to Cox that the Van Sweringens' 55% would be trusteed for the benefit of their creditors or held by their backers until coordination of their Cleveland debts, did not mean that Ball and Tomlinson were to be given complete ownership and that the Van Sweringens' share would not be available for settling their Cleveland debts, and when he finally did receive a copy of the contract, O. P. Van Sweringen was in complete control of the Empire and negotiations were continuing for a settlement of the Cleveland debts. Immediately on O. P. Van Sweringen's death in November, 1936, the Cleveland creditors began to assert their right to 55% of the stock.

Taking all these facts and circumstances into consideration, we do not think it may be said that the Cleveland creditors believed that the Van Sweringens had no ownership and acquiesced in such an arrangement. On the contrary, it tends to demonstrate that they did not acquiesce in any such arrangement. The soundness of this conclusion is emphasized by Ball's testimony that he never expected to realize more than 45% of the common stock as

the profit arising from putting up the money. Moreover, mere notice and acquiescence does not amount to a confirmation. Corbitt v. Cutcheon, 79 Mich. 41, 44 N.W. 163.

Defendants argue that the finding that "During the period when the arrangements were made and understandings reached * * *, as finally incorporated in the letter of September 21, all parties thereto knew that the payment, settlement or compromise of the claims against the partnership, based upon their existing commitments and relationships within the ten (10) year period of the contract, was inconceivable, and was beyond the range of possibility, and it was not contemplated that such claims would be either paid, settled, or compromised within that time," is not supported by the record, and they make the point that difficulty of performance was a known risk assumed by the Van Sweringens. They cite the cases of Hull v. Farmers' Loan & Trust Co., 245 U.S. 312, 38 S.Ct. 103, 62 L.Ed. 312, and Beals v. Croughwell, 140 Neb. 320, 299 N.W. 638, 138 A.L.R. 1330, dealing with the right of a donor or testator to make gifts or devise legacies to take effect only when the donee or legatee is free from debts, and Burgett v. Loeb, 43 Ind.App. 657, 88 N.E. 346, and Beacon Tool & Machine Co. v. National Products Mfg. Co., 252 Mass. 88, 147 N.E. 572, holding that a person who makes a promise or agrees to a condition which cannot be performed without the consent of a third person is not excused from his promise or from performance of the condition because of inability to secure the required consent or cooperation.

We shall not recapitulate the evidence insofar as it pertains to this contention. We doubt that the question of impossibility of performance of the condition for payment or adjustment of the debts is of controlling importance. Be that as it may, it will suffice to say that it is apparent from this record that the evidence tended strongly to support the finding. We cannot say, therefore, that there was no evidence which justified the finding, and this being so, it is not our province to exercise our independent judgment upon this question of fact. As to the cases cited by defendants, they are not applicable or controlling. They are distinguishable on their facts.

If a wrong and injury to a creditor be accomplished through the fraud of the debtor, actual or constructive, it is immaterial what form it assumes, equity will deal with the facts, the substance, without regard to forms or shadows. Lehman v. Gunn, 124 Ala. 213, 27 So. 475, 477, 51 L.R.A. 112, 83 Am.St.Rep. 159. It gives effect to the substance of the situation stripped of the illegal provisions by which it was sought to conceal its character. The effect of the court's finding was that the contract was a device resorted to by Ball and the Van Sweringens to hinder, delay, and defraud their creditors. Under such a record we believe the device, designed to cover up the fraud, was a nullity, and the law looks upon the contract as if it had never been executed. Such a contract can never be justified or sanctified by any new shape or by forms or recitals. This principle is as old as the law of morals. Booth v. Bunce, 33 N.Y. 139, 88 Am.Dec. 372.

Defendants' next contention is that plaintiff's claim is unenforceable because it is based on the right of Van Sweringens to compensation for services which were found to be violative of their fiduciary duties, and they argue that no one claiming through the Van Sweringens can properly be awarded compensation for such services.

In support of their contention, defendants rely principally upon the case of McMullen v. Hoffman, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117. In that case McMullen sought an accounting of profits claimed to have been made by the defendant upon a contract for the construction of a pipe line, basing his right thereto upon a contract between himself and the defendant, by which they agreed to make separate bids on the pipe line. The bids were not to be in reality competitive. It was agreed that whoever got the contract would permit the other to share in the profits. No disclosure was made to the parties for whom the pipe line was to be constructed that McMullen and the defendant had such an arrangement.

In denying recovery the court said:

"In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract." Page 654 of 174 U.S., page 845 of 19 S.Ct., 43 L.Ed. 1117.

Hence defendants argue that since plaintiff's claim is unenforceable, as a matter of

public policy, they should be allowed to retain the full benefits of their conversion.

A person does not become an outlaw and lose all rights by doing an illegal act. Courts grant relief against present wrongs and enforce existing rights, although the property involved was acquired by some past illegal act, Loughran v. Loughran, 292 U.S. 216, 228, 54 S.Ct. 684, 78 L.Ed. 1219, and where an agreement has been executed, completed—is at an end— when the illegal transaction has been consummated and property rights have vested, subsequent rights will not be denied because of illegality in their acquisition. Brooks v. Martin, 2 Wall. 70, 69 U.S. 70, 17 L.Ed. 732; Planters' Bank v. Union Bank, 16 Wall. 483, 83 U.S. 483, 21 L.Ed. 473; National Bank & Loan Co. v. Petrie, 189 U.S. 423, 23 S.Ct. 512, 47 L.Ed. 879; United States Express Co. v. Lucas, 36 Ind. 361; Judson v. Buckley, 2 Cir., 130 F.2d 174; and Union Pac. R. R. Co. v. Durant, 95 U.S. 576, 24 L.Ed. 391.

In United States Express Co. v. Lucas, 36 Ind. 361, the court said:

"If money [has] been actually paid to an agent for the use of his principal, the legality of the transaction, of which it is the fruit, does not affect the right of the principal to recover it out of the agent's hands. For though the law would not have assisted the principal, by enforcing the recovery of it from the party by whom it was paid, because it is the policy of the law not to aid the completion of an illegal contract, yet, when that contract is at an end, the agent, whose liability arises solely from the fact of having received money for another's use, can have no pretense to retain it."

" * * * If money due to a principal on an illegal transaction should be paid over to his agent for him by the party from whom it is due, it has been held that the principal may recover it from the agent; for the contract of the agent to pay the money to his principal is not immediately connected with the illegal transaction; but it grows out of the receipt of the money for the use of his principal." Page 369 of 36 Ind.

Brooks v. Martin, 2 Wall. 70, 69 U.S. 70, 17 L.Ed. 732, involved a case in which the parties had entered into a partnership contract against public policy. The partners illegally purchased soldiers' rights to land warrants. After realization of the profits,

defendant purchased plaintiff's interest in the partnership. Plaintiff, claiming that he was induced to sell his interest in the partnership because of the fraudulent representations of defendant [Brooks] sued to set aside the sale and for an accounting. The court held that recovery could not be defeated by the claim of illegality, and said:

"Does it lie in the mouth of the partner who has, by fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong originally done or intended to the soldier? It is difficult to perceive how the statute, enacted for the benefit of the soldier, is to be rendered any more effective by leaving all this in the hands of Brooks, instead of requiring him to execute justice as between himself and his partner; or what rule of public morals will be weakened by compelling him to do so? * * * The transactions which were illegal have become accomplished facts, and cannot be affected by any action of the court in this case." Page 80 of 2 Wall., 17 L.Ed. 732.

The party for whom the pipe line in the McMullen case, supra, was constructed, was a municipal corporation. Thus it affected public rights. The court in that case distinguished Brooks v. Martin, supra, as affecting only private rights. In discussing the question the court said:

"The court refuses to enforce such a contract [the contract in the McMullen case], and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is a very dishonest one, * * * and it is only allowed for public considerations in order the better to secure the public against dishonest transactions." Page 669 of 174 U.S., page 851 of 19 S. Ct., 43 L.Ed. 1117.

In our case no public rights are involved. The arrangement pertained to the purchase of property at a public sale which had been widely advertised with a view to selling the securities at the highest possible price. The Van Sweringens, as officers of Vaness and CTB, did not initiate the sale. They could not have prevented it. They had no control over it. They bid to the limit of the financial backing that they were able to secure. Their bid was the highest. In this situation, the mere fact that Vaness and CTB had rights which might have

been successfully asserted against the Van Sweringens does not of itself enable defendants to escape liability for the conversion of the 8250 shares of stock.

Moreover, if we were to accept defendants' contention, we would have to repudiate the basic findings of the court. We would have to say that Ball and Tomlinson owned all of the common stock of Midamerica outright and merely gave the Van Sweringens a conditional option on it for their agreement to render illegal services, so that recovery herein is enforcing such an illegal contract, contrary to public policy. But the court did not so find. As we have already stated, the court found as facts, that the parties had entered into a joint venture in which Ball and Tomlinson were to receive forty-five per cent of the profits represented by 45% of the stock of Midamerica, the partnership to receive fifty-five per cent of the profits through its ownership of 55% of the stock; that the partnership performed its part of the agreement, its performance constituting the consideration for their 8250 shares and thereby their interest in the stock was available to them. Thus, the Van Sweringens, not Ball, owned the 8250 shares. The purpose of the arrangement was fully closed, completed and had come to an end.

■ True enough, the Van Sweringens, who dominated Vaness and CTB, owed to those companies a fiduciary duty in connection with the sale of the collateral pledged with Morgan. Although there was no fraud, it would seem that they did not fully discharge their fiduciary duty. Assuming that plaintiff succeeded to the position of the Van Sweringens and cannot force a claim which they could not have enforced, does it follow, under the facts in our case, that plaintiff's claim is illegal and unenforceable? We think not. The principles applicable to fiduciary obligations are primarily designed to protect the persons whose rights have been violated. Sale of the assets in Groups 1 and 3 by Morgan was not void, even though there may have been a violation of a fiduciary duty by the Van Sweringens. Twin-Lick Oil Company v. Marbury, 91 U.S. 587, 23 L.Ed. 328; Griffin v. Smith, 7 Cir., 101 F.2d 348; Bunn v. Mackin, Tex.Civ.App., 25 S.W.2d 942, We assume it was voidable, and could have been attacked by Vaness, CTB, or their stockholders or creditors, Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Burnes v. Burnes, 8 Cir., 137 F. 781; Grif-

fin v. Smith, supra, but not by a third person, Northern Mining Corporation v. Cooke Mining Co., 9 Cir., 123 F.2d 9. Ball was not an officer, director, stockholder, or creditor of either Vaness or CTB. Therefore, he may not question the validity of the sale or the title to the property purchased at such sale by Midamerica. Vermeule v. Hover, 113 Me. 74, 93 A. 37; Bunn v. Mackin, supra; Northern Mining Corp. v. Cooke Mining Co., supra. Vaness and CTB could have acquiesced in the Van Sweringens' actions, as they did for several years, and Ball would have had no right to complain. The Van Sweringens' activities, in violation of a fiduciary duty, could only affect the title of Midamerica to the assets purchased; their acts, however, could not affect the arrangements between them and Ball as to the ownership of the 8250 shares of stock.

In reaching the conclusion that plaintiff may not be denied enforcement of his claim, we have not overlooked other cases cited by defendants. These we have considered. None of them involves a state of facts similar to the instant case. They involve employment of corporate officers or employees to deal with their own corporations or the stockholders of such corporations, or cases where the arrangement was calculated to or tended directly to influence such officers or employees, being in the nature of a bribe, or violations of statutes, actual fraud, or other moral turpitude.

■ We think our conclusion is fortified by the fact that representatives of the proper parties to complain of the Van Sweringens' breach of fiduciary duty— Vaness, CTB, their stockholders and creditors—instituted actions against them. These actions were settled. After reading the comprehensive terms of the settlements which appear in the record, we are convinced that the court correctly found that there had been full satisfaction of any claims that the proper parties may have had against Midamerica, Ball, and Foundation because of the asserted violation of fiduciary duty owed by the Van Sweringens, personally, or the partnership, in the sale and purchase of the securities in Groups 1 and 3 at the Morgan sale. Although defendants assert that because they limited the releases to themselves, in the settlements which they made, Vaness and CTB have never sanctioned the conduct of the Van Sweringens, their assertion is un-

tenable. When those companies compromised their claims, they necessarily confirmed the title of Midamerica therein, so defendants may not now be heard to complain that their rights had been violated.

Defendants also argue that there is an inconsistency between the court's decision and that of the court in In re The Van Sweringen Company, 6 Cir., 119 F.2d 231, where Midamerica was allowed to prove obligations of the Van Sweringen subsidiaries purchased at the Morgan auction only in the amount actually paid therefor. But there is a fundamental difference between that case and the present cases. There, the subsidiary corporations themselves were seeking to protect their own rights, whereas here defendants are seeking to use, solely for their own benefit, whatever rights Vaness and CTB may have had at one time, even though such rights have now been extinguished by the settlements with Foundation.

Finally, defendants contend that plaintiff is estopped to maintain these actions. This contention is based on the fact that in 1937 Midland, one of the four Cleveland Banks for whom plaintiff sues, sold to Foundation 754½ shares of Midamerica common stock at a profit of $523,000, upon the theory that all the rights of the Van Sweringens in respect to the stock had terminated. The claim is made that the other three Cleveland banks approved or ratified this action of Midland, and derived financial benefit from it because they were obligated to make up the deficiency between the liabilities and the assets when the insolvency proceedings of Midland were wound up, so that by this profit their obligation was reduced pro tanto. Defendants argue that having benefited from the sale of the stock on the theory that the partnership had no rights therein, plaintiff should not now be allowed to assert that the partnership did have such rights.

The following facts must be borne in mind in considering defendants' contention. Ball knew that Tomlinson had transferred his stock to Midland. He had given his consent thereto. The negotiations for the purchase of the stock from Midland were not begun until after Ball had converted the stock by transferring 14,050 shares of Midamerica to Foundation and had parted with all personal interest therein. The negotiations for the purchase of the stock from Midland were not concluded until Foundation had sold at least 93% of Midamerica stock to Young, Kolbe and Kirby for more than six million dollars. Thus Ball knew all the facts insofar as Midland was concerned, and he was not influenced in any manner by any representation or act as to the ownership of the stock made by Midland or the other three Cleveland banks. The Cleveland banks made no representations concerning their interest in the proceeds of the sale, nor did they conceal their interest in Midland's affairs.

During all the negotiations the facts with reference to the ownership of the stock were well known to Ball, as well as to Foundation. Mr. Cox, in charge of the liquidation of the Union Trust Company, and the liquidator of the Guardian Trust, as creditors of the Van Sweringen partnership, made demands on Ball for the protection of the Van Sweringens' interest in Midamerica within a few days after O. P. Van Sweringen's death. These were followed by further conferences, by formal written demand in early February, 1937, and by the formal written demand, on April 1, 1937, of the receiver of the Van Sweringen partnership. In view of such continuing demands to and at the very time of the conversion, the contention that Ball was in some way prejudiced or misled by Foundation's subsequent unconditional purchase of the Midland stock is clearly without merit. When Ball converted the stock on April 1, 1937, thus repudiating all claims of the partnership receiver with reference thereto, he could not have, and does not claim to have, relied on any action of Midland or any other creditor of the Van Sweringens. The same thing is true as to the conversion by Foundation. By those acts Ball and Foundation assumed full responsibility for any liability that arose as a result. Neither Midland nor any other creditor of the Van Sweringens knew any facts with reference to the title to such stock that Ball himself did not know. Neither Midland nor anyone else made any representations to Ball as to the status of the claim for conversion which had already accrued or as to any effect thereof on the ownership of Midland's Midamerica stock, and there is no basis in the transaction for implying any representation to Ball or Foundation that the consequences of the original wrong would be obviated by the purchase of Midland's stock.

■■■ In order to have an estoppel, there must be a representation or concealment of material facts; the representation

must have been made with knowledge of the facts; the party to whom the representation was made must have been ignorant of the truth of the matter; the representations must have been made with the intention of inducing the other party to act; and the other party must in fact have acted thereon. Kerestury v. Elkhart Packing Co., 108 Ind.App. 148, 153, 27 N.E.2d 383; Weber v. Fohl, 111 Ind.App. 388, 394, 41 N.E.2d 648; Damler v. Baine, Ind.App., 51 N.E.2d 885, 889; Lebold v. Inland Steel Co., 7 Cir., 125 F.2d 369, 375. Virtually all the elements of equitable estoppel are lacking here. Certainly there is no showing that Ball was induced to act by any representations and then acted in reliance thereon, or that Ball was ignorant of the situation. From the foregoing it is apparent that the doctrine of equitable estoppel has no application here.

■■■ The proper function of equitable estoppel is the prevention of fraud, actual or constructive, and the doctrine should always be so applied as to promote the ends of justice and accomplish that which ought to be done between man and man. 19 Am.Jur. pp. 637, 638. It should not be diverted or turned from its proper end into an instrument of wrong, which would result here if plaintiff were held estopped. Since Ball and Foundation knew all the facts, it would be inequitable to hold that because Foundation bought Midland's interest at a substantial profit to Midland and the other banks ultimately received a benefit therefrom, there was a termination of their right to recover ten times the proportionate amount paid by Foundation for 55% of Midland's Midamerica stock. This equitable doctrine should not be applied to benefit a converter by permitting retention of the fruits of the conversion.

■■ Recognizing that equitable estoppel is inapplicable here, defendants invoke the doctrine of quasi estoppel in which reliance upon the part ▫ of the one asserting the estoppel is not necessary. Thus defendants point out that by ratifying and benefiting from Midland's sale of the 754½ shares free from any rights of the receiver, Midland elected to treat those rights as terminated and is estopped to say otherwise. As to Midland, defendants' position is sound, so 55% of the amount paid for Midland's Midamerica stock must be deducted from the recovery.

But defendants seek far too broad an interpretation and application of the doctrine of quasi estoppel when they attempt to use it to block the other creditors' right to recover. At the most, the Cleveland banks merely received a part of their own money from their benefit from Midland's sale. It is well settled that even by quasi estoppel one cannot be estopped by reason of accepting that which he is legally entitled to receive in any event. 31 C.J.S., Estoppel, § 109, p. 350, note 23. Here, the Cleveland banks were entitled to receive the proceeds or damages for the conversion of 8250 shares of Midamerica common stock. Defendants' claim, at best, is that the beneficiaries of plaintiff's trust have received the proceeds of 414.975 shares of such stock. They have never received anything on any theory for the remaining 7,835.025 shares. Since this doctrine operates as a shield, not as a sword, 19 Am.Jur. p. 639, it should not be applied beyond what is necessary to accomplish justice between the parties and so does not extend beyond the damage sustained by Ball. 19 Am.Jur. p. 640. Hence 55% of the amount paid for Midland's Midamerica common stock (plus legal interest thereon) must be deducted from the recovery.

In concluding we desire to say that we were not unmindful of the admonition recently (June 12, 1944) voiced by the Supreme Court in Baumgartner v. United States, 64 S.Ct. 1240, that a finding of fact by the District Court did not relieve us of the task of examining the foundation for the findings in this case. We have examined the record and have concluded that the findings are supported by the evidence. In view of the facts and the applicable legal principles, we are of the opinion that we would not be justified in disturbing the findings of the trial judge, who saw and heard the witnesses and who tried the case with the purpose in mind of ascertaining the exact and true relations existing between Ball, the Van Sweringens and their creditors. The plaintiff shall pay one-half of the costs taxed in these appeals.

The judgment of the District Court will be modified in accordance with this opinion, and as modified it is

Affirmed.

### On Petition for Rehearing

■ Petitioners argue that full effect has not been given to the doctrine of estoppel. True, the result reached is akin to that of set-off. But that does not indicate that there has been an erroneous ap-

plication of the doctrine of quasi estoppel. For that doctrine is essentially one of fundamental justice which must be so applied as to reach the fairest possible result in the particular circumstances. In our case, Ball paid Midland for its Midamerica stock, and should not be forced to pay for it again by including it in the recovery. Clearly, the extent that Ball was damaged was the amount that he paid for fifty-five per cent of Midland's Midamerica common stock, so this amount should, and will, be deducted from the recovery.

 Petitioners also argue that plaintiff does not own the claim which he is seeking to enforce because the receiver who transferred it to plaintiff's predecessor was powerless to transfer it, citing certain authorities which hold that a trustee in bankruptcy may not assign his right to set aside a transfer which is preferential[1] or in fraud of creditors.[2] These authorities are not applicable here because this is a case of a receiver transferring a common law right, not a case of a trustee in bankruptcy assigning a statutory right which was conferred on said trustee exclusively. A further significant distinction, and this also distinguishes Voorhees v. Carpenter, 127 Ind. 300, 26 N.E. 838, is that plaintiff sues as trustee on behalf of the Cleveland creditors, who are the owners of substantially all the claims proved against the partnership and allowed by the receiver of the partnership's assets in the receivership proceedings. This is not a situation where an individual creditor is attempting to benefit at the expense of other creditors. Plaintiff as trustee represents substantially all the creditors represented by the receiver and duly acquired with court approval all of his right as held by him for the partnership and all of its creditors. Because no question of an attempt to transfer a right of action by a receiver was involved in National State Bank of Terre Haute v. Vigo County National Bank, 141 Ind. 352, 40 N.E. 799, 50 Am.St.Rep. 330, it is without force here.

 Since a right of action for conversion is a property right which is assignable, 4 Am.Jur. p. 255 and cases there cited, and since the court having control of a receivership undoubtedly has the power to authorize and confirm a disposition of any asset or property right of the estate which will be beneficial to the creditors, this plaintiff who in fact represents the creditors of the partnership estate may maintain this action.

The petition for rehearing is denied.

---

[1] Belding-Hall Mfg. Co. v. Mercer & Ferdon Lumber Co., 6 Cir., 175 F. 335; Grass v. Osborn, 9 Cir., 39 F.2d 461; Compton v. Three Rivers Glass Co., Tex.Civ. App., 43 S.W.2d 175; Parker v. Hand, 299 Ill. 420, 132 N.E. 467.

[2] Webster v. Barnes Banking Co., 10 Cir., 113 F.2d 1003; Neuberger v. Felis, 203 Ala. 142, 82 So. 172.